P. v. Stevenson 

No. 2--01--1350

_________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_________________________________________________________________

DONALD L. CRESS, ) Appeal from the Circuit

) Court of Du Page County.

Plaintiff-Appellee and      )

     Cross-Appellant, ) 

) 

v.                                   )    No. 97--L--703

                )

RECREATION SERVICES, INC.,       )

LARRY M. DONOVAN, and RECREATION )

SERVICES, INC., DEFERRED         )

COMPENSATION PLAN, ) 

                                 )    Honorable

     Defendants-Appellants and ) Hollis L. Webster,

Cross-Appellees. ) Judge, Presiding.  

_________________________________________________________________

JUSTICE O'MALLEY delivered the opinion of the court: 

Defendants, Recreation Services, Inc. (RSI), Larry Donovan, and Recreational Services, Inc., Deferred Compensation Plan (Plan), appeal from a judgment entered in favor of plaintiff, Donald Cress, on his claims for breach of contract and tortious interference with contract, which were tried to a jury, and his claim for declaratory relief under the Employment Retirement Income Security Act (ERISA) (29 U.S.C. §1001 
et seq.
 (1994)), which was tried to the bench.  Defendants appeal on various grounds.  Plaintiff cross-appeals.  We affirm in part and reverse in part and remand for further proceedings consistent with this opinion.                

BACKGROUND

In his complaint, plaintiff alleged that he had been an employee of RSI for 30 years until he was terminated on May 8, 1997, in contravention of a deferred compensation agreement (Agreement), which, he claimed, contained a guarantee of employment until he reached age 65 as well as a provision for retirement benefits.  Plaintiff further alleged that Donovan, as president of RSI, knowingly and unjustifiably induced RSI to breach the contract.  Plaintiff averred that Donovan thereby acted outside the scope of his limited privilege as a corporate officer to influence the actions of RSI and was liable for tortious interference with contract.  Plaintiff claimed he was terminated at age 61 and was owed approximately four years of compensation.  Plaintiff alleged that his compensation each year included salary, a bonus, health insurance premiums, and car allowances.  Plaintiff also claimed that he was owed back wages and vacation pay.  Finally, plaintiff claimed RSI owed him retirement benefits under the Agreement.    

Plaintiff brought the following six counts in his complaint: count I (claim against RSI for breach of contract); count II (claim against RSI for violating the Illinois Wage Payment and Collection Act (Wage Payment Act) (820 ILCS 115/1 
et seq
. (West 2000))); count III (claim against Donovan for violating the Wage Payment Act); count IV (claim against Donovan for tortious interference with plaintiff's contract with RSI); count V (claim against Donovan for tortious interference with plaintiff's prospective economic advantage); and count VI (claim against the Plan for a judgment declaring plaintiff’s right to receive retirement benefits under the Agreement).   Plaintiff sought punitive damages on counts IV and V.  Counts II, III, and V were dismissed before trial.      

Before trial, plaintiff moved under section 2--1005(d) of the Code of Civil Procedure (735 ILCS 5/2--1005(d) (West 2000)) for a summary determination of whether the Agreement contained an enforceable promise that RSI would employ plaintiff until age 65 provided he was capable of performing in his position as general manager for RSI.  The trial court granted plaintiff's motion, relying on excerpts from the parties' depositions that were quoted in the pleadings.

Defendants subsequently filed a motion to dismiss plaintiff's contract and tort claims as preempted by section 514(a) of ERISA (29 U.S.C. §1144(a) 
(1994)).  The trial court denied the motion.

The trial court ordered a bifurcated trial on the remaining counts; counts I and IV would be tried to the jury and count VI to the bench.  Before trial, the court granted defendants' motion 
in limine
 barring plaintiff from introducing evidence to the jury of the value of the retirement benefits allegedly owed plaintiff under the Agreement as well as evidence of whether defendants had paid plaintiff any of those benefits.  Defendants also moved to redact all provisions related to retirement benefits from the copy of the Agreement admitted into evidence.  Reasoning that the redactions would render the Agreement incomprehensible, the court denied the motion. 

The following facts are undisputed.  Donovan established RSI in 1962 and has been its president since that time.  Initially, RSI owned and operated a single bowling center located in Kankakee.  By the late 1970s, RSI owned and operated three entertainment centers, located in Kankakee, Naperville, and Carol Stream, each of which offered bowling, billiards, arcade games, and food and alcohol.  At its peak, RSI had as many as 250 employees.  Since 1967, Donovan and his wife have been RSI's only shareholders.    

Plaintiff began working part time for RSI at the Kankakee center in 1964 and the next year became a full-time employee.  He became the manager of the Kankakee center in 1967 and manager of all three centers in 1976.  Plaintiff was promoted to vice-president and general manager in 1978 or 1979 and in that capacity reported directly to Donovan.  Plaintiff was responsible for managing the workforce and maintaining the facilities and hard assets of RSI while Donovan handled the financial affairs of the business. 

In 1993, RSI terminated its qualified pension plan for its employees, whereupon plaintiff received a lump-sum payment from the plan of $264,000, which he rolled over into an individual retirement account (IRA).  In 1994, when Donovan was 65 and plaintiff was 58, RSI and plaintiff entered into the Agreement.  The Agreement provided that if the funds in the IRA were not sufficient to provide plaintiff a monthly payment of $7,083.33 after his retirement, RSI would supply the difference.  The Agreement stated in relevant part:

"RECITALS

WHEREAS, [plaintiff] has been a key employee of RSI for approximately the last 30 years and is now its Vice-President,

and

WHEREAS, RSI wishes to retain the services of [plaintiff] 

until his retirement at age sixty-five, and 

WHEREAS, RSI wants to provide [plaintiff] with Additional

Compensation to the extent the Qualified Plan Benefits provided to [plaintiff] as a result employment [
sic
] by RSI are less than a monthly benefit of Seven Thousand Eighty Three and 33/100 dollars ($7,083.33) at attained age 65. 

THEREFORE, in consideration of the mutual promises and

covenants contained in this Agreement, the parties agree as follows:

AGREEMENT

1. Definitions.  The following words shall have the following meanings when used in this Agreement.

ADDITIONAL COMPENSATION: Deferred compensation or

pre-retirement death benefits over and above the amount normally paid or payable as Qualified Plan Benefits to the extent the actuarial equivalent of the Qualified Plan Benefits, computed at attained age 65, is less than a monthly benefit of Seven Thousand Eighty Three and 33/100 dollars ($7,083.33).  In the event [plaintiff] retires prior to age 65 said Additional Compensation shall be $7,083.33 multiplied by the quotient of the Actuarially Equivalent value of a monthly life annuity payable at age 65 divided by the Actuarially Equivalent Value of a life annuity payable at early retirement. 

ACTUARIAL EQUIVALENT: A form of benefit differing in time, period, or manner of payment from a specific benefit provided under RSI's past, present, or future Qualified Plan or Plans but having the same value when computed using One Hundred and Twenty (120) percent of the applicable interest rate and the UP-84 Mortality Table.  (Unisex Pension Mortality table of 1984) used by the Pension Benefit Guaranty Corporation. 

APPLICABLE INTEREST RATE: The interest rate which is used, determined as of the first day of the month of the earlier of [plaintiff's] retirement prior to age 65 or the date [plaintiff] reaches attained age 65, by the Pension Benefit Guaranty Corporation for the purpose of determining the present value of a lump-sum distribution on a plan's termination.

QUALIFIED PLAN BENEFITS: (1) All funds contributed to a

trust, created or organized by RSI and forming part of RSI's stock bonus, pension, or profit-sharing plan or plans for the exclusive use of its employees or their beneficiaries, that were PAID to [plaintiff] prior to his retirement plus an investment return, computed from date paid through date of retirement, on said paid funds of not less than (6) percent or the actual amount earned, whichever is greater, AND (2) all funds contributed to a trust, created or organized by RSI and forming part of RSI's stock bonus, pension, or profit-sharing plan or plans for the exclusive use of its employees or their beneficiaries, that are PAYABLE to [plaintiff] at retirement under any of RSI's past, present, or future stock bonus, pension, or profit sharing plans, excluding employee contributions and earnings on amounts employees contribute to such plans, if any.  Should Qualified Plan Benefits include funds under which [plaintiff] managed or participated in the choice of investment activity for his own account, it is assumed for purposes of computing the amount of Additional Compensation under this Agreement that employer contributions earned an annual investment return of not less than six (6) percent or the actual amount earned, whichever is greater.

2. To the extent that [plaintiff's] Actuarial

Equivalent of his Qualified Plan Benefits is less than a monthly benefit of $7,083.33, RSI will pay on a monthly basis, or fund for such payments should RSI so choose, the amount of Additional Compensation needed to provide [plaintiff] with a combined monthly benefit of $7,083.33.

3. Commencing the month after [plaintiff] attains age

65, 
(March 1, 2001), and whether or not [plaintiff] chooses to retire, RSI will commence paying to [plaintiff] said Additional Compensation on a monthly basis for the remainder of his life.

4. On [plaintiff's] retirement earlier than age 65,

due to total disability, or his early retirement prior to age 65 with the written consent of RSI, RSI will pay to [plaintiff] said Additional Compensation for a period of 120 months following the month of [plaintiff's] retirement.

* * *

9.   Should both Larry M. and Patricia B. Donovan die prior to March 1, 2001, the number of hours worked by [plaintiff] will not Exceed [
sic
] Fifty (50) hours per week unless he elects to work additional hours.

10.  It is further agreed that [plaintiff's] compensation cannot be substantially reduced prior to his retirement provided he is capable of performing as General Manager for Recreational Services, Inc."

On February 10, 1997, Donovan sent a letter to Brunswick Corporation expressing his intent to sell RSI's operating assets to Brunswick.  One of the conditions of the sale was: 

"[T]hat a same compensation agreement, through March 1, 2001, be offered by Brunswick to [plaintiff], presently the general manager and Vice-President of RSI, with the provisions that if he rejects the employment offer, or his employment is terminated early, or he decides to terminate early, Brunswick  will pay fifty percent of his present salary and benefits from date of separation through March 1, 2001."  

In a February 14, 1997, letter to Brunswick, John Ridge, RSI's attorney, wrote: "Fifty (50%) percent of [plaintiff's] compensation is $300,000--this includes salary, bonus, health insurance, automobile, employer FICA--said amount to be paid over four years." 

On April 2, 1997, RSI sold all of its assets, excluding the real estate on which the entertainment centers were located, to Brunswick.  RSI leased the real estate to Brunswick.  The leases were still in effect at the time of trial.  RSI retained a small number of employees after the sale, including plaintiff.  On April 2, 1997, RSI and Brunswick executed a consulting agreement, which provided that plaintiff would remain an employee of RSI and, in that capacity, would provide consulting services to Brunswick for a one-year period commencing April 3, 1997, for which Brunswick would pay RSI $150,000.  

On April 15, 1997, RSI removed plaintiff from his position as vice-president and general manager, although plaintiff remained an employee of RSI.  In an April 30, 1997, letter to Ridge, Larry Cassano, plaintiff's attorney, stated: 

"I understand that [plaintiff's] compensation--which includes payments by RSI for health insurance and an automobile--was substantially reduced by RSI after its recent sale of three of its locations to Brunswick. *** We ask that [plaintiff's] compensation be immediately returned to its former level." 

On May 8, 1997, Ridge informed Cassano that RSI terminated plaintiff's employment.  In a May 12, 1997, letter to Cassano, Ridge stated: 

"RSI would like to continue to pay [plaintiff] as a consultant for consulting work that he would do for Brunswick if [plaintiff] agrees to perform this function.  As RSI would not control his activities he would be a third party contractor and not an employee.  As yet, I have not heard any response to this offer.  As a benefit to [plaintiff] and at great cost to RSI, the company procured a one year contract to benefit [plaintiff]. [Plaintiff's] behavior regarding this consulting contract is a mystery to us.  The contract was for $150,000 for a one year period."  

Cassano replied as follows on May 16, 1997:

"I have received your letter dated May 12, 1997, and believe that it lacks certain important and necessary information.  For instance, what is RSI's position concerning [plaintiff's] deferred compensation and pension benefits?  When will payment be initiated in the event your offer of a one-year consulting contract is accepted?  When will payments pursuant to the Agreement *** be initiated if your offer is rejected?"  

Replying on May 28, 1997, Ridge wrote: "We suggest that [plaintiff] file a claim with [RSI] *** for any benefits he believes he is entitled to under the [Agreement]." 

Plaintiff was 61 years old when RSI fired him.  Brunswick had made only one quarterly payment under the consulting agreement before RSI fired plaintiff.  When it learned that plaintiff had been fired, Brunswick made no further payments.  In a July 21, 1997, letter to Ridge, Jeffrey Paulson, vice-president and general counsel for Brunswick, wrote:  

"[RSI] has breached its agreement with [Brunswick].  It is clear within [the consulting agreement] that the intent of the parties was that payment of the $150,000 was in consideration of [plaintiff's] services.  Since these services are no longer 

available, payment will not be forthcoming."

Plaintiff testified that Donovan informed him in February 1997 that he (Donovan) had Parkinson's disease and that he was negotiating with Brunswick for the sale of RSI.  Donovan assured plaintiff that Donovan "would not forget" plaintiff's years of service at RSI and would "take very good care" of him.  Following the sale, Donovan informed plaintiff of RSI's agreement with Brunswick whereby plaintiff would provide consulting services to Brunswick for one year at $150,000, or $12,500 a month.  Donovan told plaintiff that the consulting would involve "nothing more than what [plaintiff] was doing now" as general manager of RSI.  Donovan told plaintiff to "do what [Brunswick] ask[s] and satisfy them."  Plaintiff testified that he agreed to the consulting arrangement. Plaintiff denied that Donovan ever told him to submit written or  oral reports to RSI concerning his consultation work with Brunswick.    

Plaintiff testified that he was hospitalized in March 1997 for colon surgery.  Upon his release, he followed Donovan's instructions and began consulting for Brunswick.  He was available to provide in-person assistance to Brunswick at all times from  April 3, 1997, through May 8, 1997, with the exception of a four-day trip he took to Arizona to assist his mother-in-law.  He received advance permission for the trip from Rick Barbera, regional manager for Brunswick.  Plaintiff left a phone number where he could be contacted and phoned Brunswick each day while he was away to "touch base."  

Plaintiff testified that while he was in Arizona, Ridge left a message on plaintiff's answering machine asking where plaintiff had been and demanding that plaintiff call Ridge or "something serious is going to happen."  Plaintiff returned the call and left a message for Ridge.  Ridge subsequently phoned plaintiff six times. Plaintiff testified that the calls were "berating" and "demeaning" and left him feeling "harassed and hassled."  Plaintiff was not specific about the content of the conversations.  Plaintiff testified that he received a check in April 1997 for $11,500.  When he asked John Ridge why he received $11,500 instead of the $12,500 promised by Donovan, Ridge said that the difference represented "the employer's share of FICA."

Plaintiff testified that his attorney phoned him on May 8, 1997, and said that RSI had faxed him a notice that plaintiff's employment was terminated.  RSI also terminated plaintiff's health insurance effective June 30, 1997.  Plaintiff testified that he has received no income or benefits from RSI since his termination.  Plaintiff testified that, although RSI's policy was to issue a warning notice before terminating an employee, he received no notice prior to his termination on May 8, 1997.  

Plaintiff testified that he spoke to Donovan only three times by phone between the sale of RSI and his termination.  On the first occasion, Donovan phoned him and asked why RSI's accountants had quit despite their agreement to remain with RSI for a few weeks after the sale.  Plaintiff did not recall how he responded.  Plaintiff testified that he subsequently phoned Donovan on two occasions to ask work-related questions.  On cross-examination, plaintiff acknowledged that during discovery he stated in writing that he did not speak to Donovan at all after the sale to Brunswick.    

Plaintiff testified that the termination was "traumatic" and "humiliating."  He became depressed, and the antidepressants he took caused drowsiness and reduced his sex drive.  He suffered four or five anxiety attacks.  Plaintiff attempted unsuccessfully to find employment.  The loss of income forced him to live on savings and to sell his house in Naperville and his condominium in Florida.  Eventually, he was forced to draw on his IRA. 

On cross-examination, plaintiff admitted that he did not  pursue the consulting opportunity offered in Ridge's letter of May 12, 1997; he had assumed that his termination entailed that he could no longer consult for Brunswick.  He admitted, however, that RSI never told him he could not consult with Brunswick after his termination. 

Michael Davito testified that in 1997 he was Brunswick's director of real estate development and negotiated on behalf of Brunswick for the purchase of RSI's assets.  During meetings with Donovan and Ridge, Davito was told that plaintiff was the only RSI employee who was under contract.  Davito testified that his understanding of the February 10, 1997, letter of intent from Donovan to Brunswick was that plaintiff had a four-year employment contract with RSI.  Davito testified that Brunswick ceased paying RSI under the consulting agreement once plaintiff was fired by RSI. 

Kurt Harz, director of sales for Brunswick, testified that during Brunswick's negotiations with RSI, Donovan asked Harz if he thought Brunswick would assume half of RSI's employment contract with plaintiff as part of the sale.  

Richard Barbera, regional manager for Brunswick, testified that plaintiff provided valuable consultation to Brunswick after the sale.  Plaintiff was readily available for phone or in-site consultation.  Barbera testified that after plaintiff was fired by  RSI, he continued to assist Brunswick 
free of charge for two years.

Donovan testified that, in his opinion, the purpose of the Agreement was to provide plaintiff with retirement benefits, not to  promise him employment.  Donovan testified that when he signed the Agreement with plaintiff, his intention was to work "almost forever, if health would allow it."  Donovan was diagnosed with Parkinson's disease in October 1996 and thereafter began to consider selling RSI.  While Donovan and plaintiff were discussing the proposed consulting arrangement, plaintiff asked if he would be provided health insurance under the agreement.  As of the date of the sale, there were no employees left on RSI's health insurance plan; Donovan and his wife were on Medicare.  RSI's insurance agent told Donovan that the RSI policy could be continued only if at least four people were insured under it.  The agent also told Donovan that plaintiff would have difficulty procuring insurance from a new carrier because of his health problems.  After "crossing some loopholes," Donovan and his wife enrolled in the RSI plan and, together with plaintiff and his wife, comprised the minimum of four insurers needed to continue the plan. 

Donovan testified that he feared that the morale of RSI employees would diminish when they learned of the sale.  Donovan asked plaintiff to "represent" him 
vis-a-vis
 the employees and "allay any misapprehensions."  The two decided on a particular date on which to inform the employees of the sale.  Sometime later, but prior to the date of the announcement, plaintiff told Donovan that Donovan had "erred grievously" by not informing the employees of the sale earlier.  Subsequently, news of the sale was leaked by a Brunswick employee in South Dakota and then spread quickly to RSI.  Donovan testified that RSI employees became "very cool" toward him and manifested "almost a dislike, hatred" for him.  Donovan felt that plaintiff "was personally responsible for not correcting that."  Donovan was "very upset" with plaintiff because he felt plaintiff "betrayed a confidence and a trust."  Donovan expressed his displeasure to plaintiff over the phone but never submitted any written reprimand.  Because Donovan felt that plaintiff had not represented Donovan's interests in dealing with the other employees, Donovan demoted plaintiff from general manager and vice-president to a regular employee on April 15, 1997.  Donovan did not himself communicate this to plaintiff, but did so through Ridge.  

Donovan testified that there was no need to retain plaintiff as an officer of RSI after the sale because there was nothing left for him to do.  Donovan testified that, in his interpretation, the statement in paragraph 10 of the Agreement that plaintiff's salary could not be substantially reduced provided he was capable of performing as general manager for RSI was contingent on there being work available for plaintiff to perform, which there was not after the sale.

Donovan testified that on May 8, 1997, Donovan, through Ridge, informed plaintiff that his employment with RSI was terminated.  Asked what reason he had for demoting and then terminating plaintiff other than his belief that plaintiff had been disloyal, Donovan testified that plaintiff failed to submit to RSI written reports concerning his consultations with Brunswick, as was required.  Donovan admitted, however, that plaintiff was not informed of the requirement of written updates until the May 12, 1997, letter from Ridge to Cassano, which was after plaintiff was fired.  Still, Donovan testified, he expected from the beginning of plaintiff's consulting with Brunswick that plaintiff would submit some sort of updates, which plaintiff failed to do.  Donovan also testified that he was displeased because plaintiff traveled to Arizona in April without Donovan's permission.  

Donovan testified that he believed plaintiff had already abandoned his employment before he was officially terminated because he had failed to communicate with RSI about his consulting.  Donovan admitted, however, that he disagreed with nothing in Davito's assessment of the quality of plaintiff's consulting. On cross-examination, Donovan testified plaintiff had been a "key employee" and a "critical asset" who contributed highly to RSI's profitability.  Donovan testified that any money that RSI does not disburse belongs to him and his wife as sole shareholders of RSI.  Donovan admitted that RSI's failure to pay plaintiff "leaves just that much more for" Donovan and his wife.  Donovan testified that he was aware of plaintiff's health problems and his March 1997 hospitalization when he fired plaintiff. 

Over defendants' objection, plaintiff introduced evidence that Donovan sold RSI's assets to Brunswick for $3 million and that the real estate leases between RSI and Brunswick each required annual payments ranging from $100,000 to $675,000 over 15 years.  In response, Donovan testified that the sale proceeds were entirely absorbed by RSI's debts.  Donovan also testified that there are outstanding mortgages on the real estate leased to Brunswick.  Asked what he invested in the entertainment centers, Donovan testified that the Carol Stream center and the land it occupies have a combined value of $8 million compared with the annual lease payment of $425,000 for Brunswick's use of the land--which yields a rate of return of 5.3% per year.  

Plaintiff's and Donovan's testimony established that, prior to the sale of RSI to Brunswick, plaintiff's yearly compensation was $151,521.76, which consisted of salary ($140,601.76), car allowance ($6,300), and health insurance ($4,620).  

During Donovan's testimony, plaintiff asked the court to reconsider its ruling barring evidence of the value of the retirement benefits provided for in the Agreement.  The court held that plaintiff could introduce evidence of the value of the retirement benefits for the purpose of disputing the likelihood that plaintiff, as Donovan claimed, elected to relinquish his retirement benefits by abandoning his employment with RSI before age 65.  The court, however, adhered to its previous ruling that plaintiff could not introduce evidence that RSI had not paid the retirement benefits. 

Later, the following colloquy occurred during the examination of Donovan by plaintiff's attorney:

"Q.  Turning to the retirement income, the deferred compensation, that was to commence after age 65, correct? 

A. Yes.

Q. That was a substantial amount of money promised to

him, right? 

A. Yes.

Q. Now, we're not going to go into whether [plaintiff]

is entitled to any deferred compensation.  That's for another day.

But is it not a fact, Mr. Donovan, that RSI has

refused to pay the retirement income as well, and that's going to be resolved another day?

MR. RIDGE.  Objection, your Honor.

THE COURT.  Sustained.  I'd ask the jury to disregard

that."

The court then instructed the jury as follows:

"THE COURT.  Ladies and gentlemen, at this time I'm 

going to give you a preliminary instruction with respect to the deferred compensation element of the agreement that has been discussed by the witnesses in this case.

And that instruction is, any compliance or lack thereof

with the deferred compensation or payment after age 65 to [plaintiff] is not an issue that you'll be deciding.  That's an issue that will be decided in a separate forum.  So, that is not an issue that's relevant to your consideration of the other issues that you're deciding."

Defendants moved for a mistrial, and the trial court denied the motion.

Thomas Doherty, an actuary, testified that, assuming plaintiff would have remained at RSI until age 65 and taking into account plaintiff's life expectancy, plaintiff would have lived to collect $391,574 in additional compensation.  Therefore, Doherty concluded, the total value of the retirement benefits under the Agreement was $391,574 on February 7, 2001, the date plaintiff reached age 65 and would have been eligible to receive the benefits had he remained at RSI. 

During closing arguments, plaintiff's attorney remarked that  Donovan is a "wealthy man" and that he "sold RSI for about $22,000,000 and *** gets to keep the land."  Defendants objected without stating their grounds.  The court sustained the objection and instructed the jury to disregard the remark.  Shortly thereafter, plaintiff's attorney commented that Donovan and plaintiff "[t]ogether built [RSI] into a $22,000,000 company."  Defendants again objected but stated no grounds.  The court sustained the objection.  Plaintiff's attorney then made the following remarks:

"MR. CASSANO.  Let me make a suggestion regarding punitive damages.  

The assets of RSI were sold to Brunswick for about $22,000,000, three million up front and then the rent.

[Plaintiff] and [Donovan] built that business as a team.

And I submit to you that punitive damages in this case should be half of the value of the assets, or $11,000,000."

Defendants objected, claiming the evidence did not support the figures plaintiff proposed.  The court overruled the objection.

During deliberations, the jury submitted the following written question to the court: "In the subject regarding the tort count in proving malice, is Mr. Donovan acting as a private individual or as a corporate officer?  We need clarification."  The trial court replied that the jury should rely on the instructions given.

The jury returned a verdict in favor of plaintiff on counts I and IV.  On count I (breach of contract), the jury awarded plaintiff $580,833.41 in damages (representing approximately four years of plaintiff's compensation at $151,521.76 per year).  On count IV (tortious interference with contract), the jury awarded plaintiff $2,500,000 in damages, which included $400,000 for loss of a normal life, $400,000 for emotional distress, $700,000 for lost compensation, and $1 million in punitive damages.  The court also awarded attorney fees and costs in the amount of $354,575 under section 502(g)(1) of ERISA (29 U.S.C. §1132(g)(1) (1994)).  The court further awarded prejudgment interest on the breach of contract claim.  The court denied plaintiff's request for attorney fees under the Attorneys Fees in Wage Actions Act (the Wage Actions Act) (705 ILCS 225/0.01 
et seq.
 (West 2000)).   

Following the bench trial, the court found for plaintiff on count VI.  The court found that RSI owed plaintiff $391,574 in retirement benefits and awarded it paid in a lump sum. 

Defendants filed a posttrial motion arguing several grounds for relief.  The trial court accepted defendants' claim that the 

damages awarded under count IV for lost compensation duplicated the damages awarded on count I.  The court therefore reduced plaintiff's damages by $580,833.41 and denied defendants' posttrial motion in all other respects.  Defendants appeal.  Plaintiff cross-appeals, contesting the trial court's reduction of his damages and the court's refusal to award fees under the Wage Actions Act.     

ANALYSIS

I.  The Deferred Compensation Agreement 

We address first defendants' challenge to the trial court's summary determination that the Agreement contains an enforceable promise of employment.  Defendants first argue that the trial court erred in using extrinsic evidence to interpret the Agreement.  A trial court may not employ extrinsic evidence in construing a contract unless it is necessary to resolve an ambiguity in the contractual terms.  
Air Safety, Inc. v. Teachers Realty Corp.
, 185 Ill. 2d 457, 462 (1999).  We agree with defendants that the relevant portions of the Agreement are not ambiguous.  However, we may affirm a trial court's ruling on any basis in the record.  
People v. Everette
, 141 Ill. 2d 147, 158-59 (1990).  We find in the plain language of the Agreement an alternative and sufficient basis for concluding that the Agreement contains a binding promise of employment.  

The primary goal in construing a contract is to give effect to the intent of the parties.  
Omnitrus Merging Corp. v. Illinois Tool Works, Inc.
, 256 Ill. App. 3d 31, 34 (1993).  Paragraph 10 of the agreement provides: "It is *** agreed that [plaintiff's] compensation may not be substantially reduced prior to his retirement provided he is capable of performing as General Manager for Recreational Services, Inc."  Defendants argue that this provision merely reinforces that the "Additional Compensation" (the difference between the monthly payment available from the IRA and the $7,083.33 monthly payment guaranteed under the Agreement) would be paid by RSI, not subtracted from plaintiff's salary.  In our view this is not a reasonable construction of the contract.  The source of the additional compensation is unequivocally identified elsewhere in the contract; paragraph 2 states that "RSI will pay  on a monthly basis, or fund for such payments should RSI so choose, the amount of Additional Compensation needed to provide Cress with a combined monthly benefit of $7,083.33."  Defendants would have us view paragraph 10 as superfluous.  We decline.  It is presumed that all provisions in a contract were inserted for a purpose.  
Magnuson v. Schaider
, 183 Ill. App. 3d 344, 358 (1989).  If paragraph 10 was included merely to underscore that RSI was obligated to supply all of the additional compensation, then the parties certainly would have stressed that plaintiff's compensation could not be reduced 
at all
.  They did not, however, but instead provided that plaintiff's salary could not be 
substantially
 reduced.  Thus, defendants fail to persuade us that the parties inserted paragraph 10 for the sake of redundancy. 

Paragraph 10, we note, does not define "retirement" or otherwise indicate how long RSI is obligated not to substantially reduce plaintiff's salary.  Plaintiff directs us to the second of the contract's recitals: "WHEREAS, RSI wishes to retain the services of [plaintiff] until his retirement at age sixty-five."  Reading this recital in concert with paragraph 10, plaintiff concludes that the Agreement guaranteed that his salary would not be substantially reduced prior to his reaching age 65.  Defendants argue that this recital is a "[a] statement of expectation" that "does not amount to a binding promise of employment."  Defendants are correct that recitals generally are considered nonbinding explanations of the circumstances surrounding the execution of a contract.  See 
McMahon v. Hines
, 298 Ill. App. 3d 231, 237 (1998).  Plaintiff, however, asks us to view the recital not as a statement of obligation in itself but as an aid to construing an obligation elsewhere in the contract.  "Resort will be had to the recitals of a contract if necessary to determine the intention of the parties and of the operative provisions of the agreement."  
In re Estate of Anderson
, 195 Ill. App. 3d 644, 649 (1990).  When interpreting a contract, a court must consider the document as a whole, rather than focus upon isolated portions.  
Spectramed Inc. v. Gould Inc.
, 304 Ill. App. 3d 762, 770 (1998).  The recital, which expresses RSI's wish to retain plaintiff until "his retirement at age sixty-five," indicates the duration and scope of RSI's obligation in paragraph 10 to maintain plaintiff's salary.  We agree with plaintiff that paragraph 10, read in light of the recital, evinces the parties' intent that RSI not substantially reduce plaintiff's salary prior to his reaching age 65.  The promise entails, logically, that RSI cannot terminate plaintiff prior to his reaching age 65.   

We recognize that paragraph 3 of the Agreement provides that RSI will pay plaintiff the additional compensation upon his reaching age 65, "whether or not he chooses to retire."  We agree with defendants that paragraph 3 clearly indicates that plaintiff need not retire from RSI at age 65 whereas the recital apparently contemplates plaintiff retiring at age 65.  Nonetheless, we do not believe that paragraph 3 undercuts plaintiff's construction of paragraph 10.  Given that plaintiff was to receive the additional compensation upon reaching 65, we believe it is reasonable to infer that the parties' intention in drafting the recital was not to fix a precise termination date for the employment relationship but to assure plaintiff that RSI would employ him at least until age 65, when he would begin receiving the additional compensation.  We accept this inference notwithstanding the implication in the recital that plaintiff would retire at age 65, because the obligations and promises of the parties in the operative portion of a contract prevail over a preliminary recital or preamble (
Brookens v. Peabody Coal Co.
, 11 Ill. 2d 322, 325 (1957)).  Thus, we conclude that paragraph 10, taken together with the recital, established an enforceable promise on the part of RSI to employ plaintiff at least until he reached age 65. 

Defendants next contend that an agreement to employ plaintiff at least until age 65 is of indefinite duration and therefore not binding.  Illinois is an employment-at-will state.  
Harris v. Eckersall
, 331 Ill. App. 3d 930, 934 (2002).  Absent a specific contract to the contrary, an employment relationship may be terminated at any time and for any reason by either party (with limited exceptions not relevant here).  
Harris
, 331 Ill. App. 3d at 934.  An employment agreement that provides for employment of indefinite duration is terminable at will.  
Jesperson v. Minnesota Mining & Manufacturing Co.
, 183 Ill. 2d 290, 293 (1998).  One manner in which parties may alter the at-will relationship is to provide a specific temporal duration of employment.  See, 
e.g.
, 
Berutti v. Dierks Foods, Inc.
, 145 Ill. App. 3d 931, 933 (1986) (statement, " 'Guaranteed salary for twelve months of $750.00 per week,' " created  employment contract).  However, a specific temporal duration of employment need not be provided to overcome the presumption of at-will employment.  An employment agreement articulating cognizable events upon which termination may occur is not perpetual and terminable at will and will be upheld even in the absence of a specified termination date.  
Peters v. Health & Hospitals Governing Comm'n
, 91 Ill. App. 3d 1104, 1107 (1980), 
rev'd on other grounds
, 88 Ill. 2d 163 (1981); 
Dawson v. W.&H. Voortman, Ltd.
, 853 F. Supp. 1038, 1042 (N.D. Ill. 1994) ("Under Illinois law, a contract provision that fails to specify the length of the term of employment, but that does set forth conditions upon which termination may be based, is not terminable at will, but is terminable upon the existence of those conditions"); see also 
Donahue v. Rockford Showcase & Fixture Co.
, 87 Ill. App. 2d 47, 54 (1967) (provision that plaintiff's position as salesman " 'would be automatically cancelled' " if sales were less than $25,000 per year created a binding contract because it set "a condition, upon the happening of which, the contract would have been terminated").  Paragraph 10 of the Agreement conditions the salary guarantee on plaintiff's capacity to perform his duties as general manager of RSI and, therefore, creates a binding employment agreement.  See 
Dawson
, 853 F. Supp. at 1042 (provision that plaintiff's position as salesman would continue as long as he "is willing and able to conduct his business according to the policies and procedures" contained in an employee handbook created binding employment contract).

Defendants next argue that any enforceable contract for employment in the Agreement is so intertwined with the provisions relating to  retirement compensation that plaintiff's contract and tort claims based on the employment contract are preempted by ERISA.  Before reaching the merits of defendants' preemption argument, we address defendants' claim that plaintiff waived his argument against preemption because he argued the very opposite earlier in this case.  In his motion to remand this case to state court after defendants had removed it to federal court, plaintiff argued that removal was improper because defendants did not file their notice of removal within the time allowed by statute after they received a pleading from plaintiff that reflected a basis for removal.  Plaintiff stated that the basis for removal evident in the allegations of his complaint was that ERISA preempted plaintiff's state law claims.  Defendants claim that "[t]he law does not permit parties to take one position at one stage of a case and a diametrically opposite position in another case.  Parties are bound by their earlier position."  Defendants claim to have derived this proposition from 
Holzer v. Motorola Lighting, Inc.
, 295 Ill. App. 3d 963 (1998), but we read 
Holzer
 much differently.  In 
Holzer
, the appellate court held that the appellants waived their argument because they failed to raise it in the court below.  
Holzer
, 295 Ill. App. 3d at 978.  Defendants rely on the court's incidental remark that the appellants not only failed to raise the argument previously but in fact pressed the "diametric opposite" of the argument in the court below.  See 
Holzer
, 295 Ill. App. 3d at 978.  This remark, in our view, was nonbinding 
obiter dictum
.  See 
Cates v. Cates
, 156 Ill. 2d 76, 80  (1993) (
obiter dictum
 is "a remark or opinion uttered by the way," which is "not binding as authority or precedent within the 
stare decisis
 rule").  Although defendants do not label it as such, the proposition they claim to derive from 
Holzer
 sounds much like the doctrine of judicial estoppel, which provides that, when a party assumes a certain position in a legal proceeding, that party is estopped from assuming a contrary position in a subsequent legal proceeding.  See 
People v. Coffin
, 305 Ill. App. 3d 595, 598 (1999).  However, as 
Holzer
 itself acknowledges, judicial estoppel does not apply to legal positions (
Holzer
, 295 Ill. App. 3d at 977) and therefore cannot be raised against plaintiff's legal position that his contract and tort claims are not preempted by ERISA.  

Reaching the merits of defendants' preemption argument, we note that section 514(a) of ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" falling within ERISA's scope.  29 U.S.C. §1144(a) (1994).  "Employee benefit plan" includes "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan."  29 U.S.C. §1002(3) (1994).  An "employee pension benefit plan" is "any plan fund, or program" that "provides retirement income to employees."  29 U.S.C. §1002(2)(A)(i) (1994).  An "employee welfare benefit plan" is:

"any plan, fund, or program *** established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, *** medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds or prepaid legal services."  29 U.S.C. §1002(1)(A) (1994).     

"State law," for purposes of ERISA preemption under section 514(a), includes "all laws, decisions, rules, regulations or  other State action having the effect of law."  29 U.S.C. §1144(c) (1994).  A 
state law "relates to" a covered employee benefit plan for purposes of section 514(a) of ERISA if it has a "connection with" or "reference to" such a plan.  
California Division of Labor Standards Enforcement v. Dillingham Construction, N.A., Inc.
, 519 U.S. 316, 324, 136 L. Ed. 
2d 791, 799, 117 S. Ct. 832,  837 (1997).  A state law has a "reference to" an ERISA plan if the law acts immediately and exclusively upon ERISA plans or where the existence of ERISA plans is essential to the law's operation.  
Dillingham
, 519 U.S. at 325, 136 L. Ed. 2d at 799, 117 S. Ct. at 838.  In determining whether a state law has a "connection with" an ERISA plan, the court must examine the objectives of ERISA and the nature of the effect of the particular state law on ERISA plans.  
Dillingham
, 519 U.S. at 325, 136 L. Ed. 2d at 799-800, 117 S. Ct. at 838.  The party claiming preemption of state common law claims (such as plaintiff's common law and tort claims) bears "the considerable burden of overcoming 'the starting presumption that Congress does not intend to supplant state law.' " 
De Buono v. NYSA-ILA Medical & Clinical Services Fund
, 520 U.S. 806, 814, 138 L. Ed. 2d 21, 29, 117 S. Ct. 1747, 1752 (1997), quoting  
New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co.
, 514 U.S. 645, 654, 131 L. Ed. 2d 695, 704, 115 S. Ct. 1671, 1676 (1995).  Whether a federal law preempts a state law is a question of law; the trial court's determination of that issue is reviewed 
de novo
.  
Kernats v. Smith Industries Medical Systems, Inc.
, 283 Ill. App. 3d 455, 458-59 (1996).    

Defendants' argument for the preemption of plaintiff's contract and tort claims is that the provisions in the Agreement relating to employment compensation "cannot sensibly be divorced from the parts that deal with payments upon retirement."  We rejected this argument above in holding that the provisions in the Agreement relating to plaintiff's preretirement compensation operate entirely independently of the provisions relating to retirement income.  

Defendants cite several cases to support their preemption argument, all of which we find inapposite.  The first two, 
Arnold v. Babcock & Wilcox Co.
, 123 Ill. 2d 67 (1988), and 
Dranchak v. Akzo Nobel, Inc.
, 88 F.3d 457 (7th Cir. 1996), are easily distinguishable because the employment benefits at issue in both cases were all retirement benefits.  See 
Arnold
, 123 Ill. 2d at 71-72 (claim for severance benefits); 
Dranchak
, 88 F.3d at 459 (claim for "extra pension credits, unreduced payments in the event of early retirement (or discharge), the continuation of health benefits under the firm's welfare plan, and similar emoluments").  Neither 
Arnold
 nor 
Dranchak
 concerned preretirement compensation and neither, therefore, has any bearing on how we should view the relation between the provisions in the Agreement dealing with preretirement compensation and retirement income. 

Defendants also cite 
Ferrer v. Banco Central Hispano-Puerto Rico, Inc.
, 142 F. Supp. 2d 190 (D. P.R. 2001).  In 
Ferrer
,  the plaintiff challenged the removal of his action to federal court.  According to the court, the complaint sought "specific compliance and damages related to a contract under the Banco Central Hispano Employees' Pension Plan."  
Ferrer
, 142 F. Supp. 2d at 192.  The court noted that the plaintiff stated in his complaint that his claim concerned "a salary and certain fringe benefits, among which was included a pension plan."  
Ferrer
, 142 F. Supp. 2d at 193.  The district court held that the removal was proper because the plaintiff's claim, although styled purely as a state law claim, was preempted by ERISA because the "claim not only is connected to the pension plan; rather, the plan is the basis for [p]laintiff's claim."  
Ferrer
, 142 F. Supp. 2d at 194.

Ferrer
 is unhelpful in the case before us.  The 
Ferrer
 court did not indicate at all the relation between the plaintiff's salary claim and his claim for pension benefits.  There was no reference, for instance, to whether plaintiff's pension benefits were tied in any way to his salary.  Without this factual background, 
Ferrer
 provides no guidance in a case such as this where an argument for preemption is based on the claim that provisions in the same contract relating to employment compensation and retirement benefits are inextricably related.  

Since plaintiff's claim for employment compensation is not related to his claim for retirement benefits, we hold that there is no preemption in this case. 

II. Issues Concerning Pleading and Proof of Tortious

 Interference With Contract  

Defendants advance several arguments related to plaintiff's pleading and proof of his claim for tortious interference with contract.  To succeed in proving that the defendant committed tortious interference with contract, the plaintiff must plead and prove: (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of the contractual relationship between the plaintiff and another; (3) the defendant's intentional and unjustifiable inducement of a breach of the contract; (4) a breach of contract by the other caused by the defendant's wrongful acts; and (5) damage to the plaintiff.  
Grund v. Donegan
, 298 Ill. App. 3d 1034, 1038 (1998).

In addition, where the plaintiff alleges that the  defendant, in his capacity as a corporate officer, tortiously interfered with a contract between the plaintiff and that corporation, the plaintiff must plead that the defendant acted outside the qualified privilege he enjoys as a corporate officer to influence the actions of the corporation.  
HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc
.
, 131 Ill. 2d 145, 156 (1989); 
Mittelman v. Witous
, 135 Ill. 2d 220, 249 (1989).  "This qualified privilege does not apply where officers act 
solely
 for their own gain or 
solely
 for the purpose of harming [the] plaintiff since such conduct is not undertaken to further the corporation's interest."  (Emphasis in original.)  
Mittelman
, 135 Ill.2d at 249.  The rule in 
Mittelman
 is derived from a statement in 
HPI
.  See 
Mittelman
, 135 Ill. 2d at 249; 
HPI
, 131 Ill. 2d at 158-59 ("[A] hospital management company, whose privilege is based upon the management company's role in exercising business judgment on behalf of the company's hospital, would not be justified in inducing a breach of contract solely for the management company's gain, or solely for the purpose of harming the plaintiff, since such conduct would not have been done to further the hospital's interests").  
HPI
's statement in turn is derived from remarks in an appellate court case.  See 
HPI
, 131 Ill. 2d at 159, citing 
Certified Mechanical Contractors, Inc. v. Wight & Co.
, 162 Ill. App. 3d 391, 401 (1987) ("If an architect induces a breach of contract, not to further its principal's best interest, but with the intent to harm the other party to its principal's contract or to further its personal goals, the architect is liable for tortious interference with contract").

Defendants argue first that plaintiff's claim for tortious interference with contract was deficient as a matter of law because "there simply was no allegation [in the complaint] *** claiming *** that [Donovan's] conduct harmed RSI."  This is false.  Plaintiff alleged in his complaint that plaintiff's termination as an employee of RSI led Brunswick to cease its payments to RSI under the consulting payment.  Plaintiff further alleged that these payments "would have defrayed part of RSI's cost of honoring its obligations to plaintiff under RSI's contract with plaintiff."  Therefore, plaintiff averred, "Donovan, in inducing RSI to terminate plaintiff, was clearly acting against the best interest of RSI and instead acting to annoy and injure plaintiff."  These clearly are allegations that Donovan harmed RSI. 

At any rate, we conclude from 
Mittelman
, 
HPI
, and 
Wight
 that a plaintiff who claims that the defendant's conduct exceeded the qualified privilege for corporate officers need not plead and prove that the defendant's conduct actually harmed the corporation.  The quotations from these cases show that Illinois law forbids a corporate officer from interfering with a contract between his corporation and the plaintiff solely out of self-interest or solely  from a desire to harm the plaintiff because such action done with such motives is 
ipso facto
 not in the corporation's interest.  Specific harm to the corporation need not be pleaded or proved.  Therefore, we reject defendants' argument that plaintiff inadequately pleaded tortious interference with contract by failing to indicate specifically how Donovan harmed RSI.  

Defendants next argue that, as a matter of law, Donovan cannot be held liable for tortious interference with contract because plaintiff's allegation is that Donovan induced RSI to breach the Agreement in his capacity as president of RSI.  Acting in that capacity, Donovan was, defendants argue, indistinguishable from RSI.  Because a defendant cannot tortiously interfere with a contract to which he is a party (
Fiumetto v. Garrett Enterprises, Inc.
, 321 Ill. App. 3d 946, 957 (2001)), defendants conclude that plaintiff's claim fails as a matter of law.        

We disagree.  The mere fact that the defendant was acting as a corporate officer in inducing a breach of his corporation's  contract will not render the defendant and the corporation identical for purposes of tortious interference with contract. 
Under 
Mittelman
, 135 Ill. 2d 220, the question of whether a corporate officer is identical with a corporation for purposes of tortious interference with contract is the same question as whether the officer acted within the qualified privilege in inducing the breach of the contract between the plaintiff and the officer's corporation.  In 
Mittelman
, the plaintiff sued defendant for tortious interference with a business advantage, claiming that defendant, as the president of the plaintiff's law firm, wrongfully induced the firm to fire the plaintiff.  The defendant asserted in response that he was not a "third party" to the plaintiff's contract with the law firm and, as a matter of law, could not be held liable for tortious interference with a business advantage.  The court considered the issue of identity the same as whether the defendant's conduct fell within the "qualified privilege" doctrine, which holds that "[a] corporate officer may, for a proper business purpose and in good faith, influence the actions of the corporation."  
Mittelman
, 135 Ill. 2d at 249.  The court noted that if the defendant failed to act in the corporate interest in firing the plaintiff, then "he and the corporation are not one and the same for purposes of tortious interference analysis."  
Mittelman
, 135 Ill. 2d at 250.  Therefore, contrary to defendants' position, a corporate officer's claim that he is not distinguishable from the corporation for purposes of tortious interference with contract hinges, as does the question of whether the qualified privilege applies, on whether the officer was acting in the corporation's interest or in his own interest in inducing the breach of the corporation's contract.  We address below whether the evidence  at trial satisfied the elements of tortious interference with contract, including whether the qualified privilege applied to Donovan's actions.   

Fiumetto
, upon which defendants rely, is a recent case from this district.  In 
Fiumetto
, Garrett, president and sole shareholder of Garrett Enterprises, terminated the plaintiff's employment with Garrett Enterprises.  The plaintiff brought a claim against Garrett individually for tortious interference with a business advantage.  The appellate court held that the claim was insufficient as a matter of law:  

"[P]laintiff has alleged that Garrett was acting in her official capacity when she discharged plaintiff.  It is well established that a party cannot tortiously interfere with a contract to which he is a party. [Citation.]  Since Garrett was acting in her official capacity, she was acting on behalf of the corporation.  Thus, plaintiff's claim amounts to an assertion that the corporation tortiously interfered with a contract to which it was a party.  This claim must be rejected."  
Fiumetto
, 321 Ill. App. 3d at 957.

Fiumetto
 did not apply the qualified privilege analysis set forth in 
Mittelman
.  The sole allegation alluded to in 
Fiumetto
 was that Garrett was acting in her official capacity in terminating the plaintiff.  As noted above, the burden is on the plaintiff to plead facts demonstrating that the defendant acted outside the scope of his or her qualified privilege in order to benefit from the doctrine set forth in 
Mittelman
.  
HPI Health Care
, 131 Ill. 2d at 156.  There is no indication that the plaintiff in 
Fiumetto
 pleaded that Garrett acted outside the qualified privilege in terminating the plaintiff.  Hence, the 
Fiumetto
 court did not reach the issue of whether Garrett's termination was not in the interest of Garrett Enterprises.  
Fiumetto
 does not hold, as defendants suggest, that a corporate officer may never be found to have tortiously interfered with a contract between the corporation and a third party because corporate officers are always indistinguishable from their corporations for purposes of the tort.  Rather, 
Fiumetto
 simply had no occasion to determine whether the exception to the default rule of indistinguishability applied in that case. 

Defendants next argue that the jury instructions on tortious interference with contract were, at best, "confusing" and, at worst, contrary to law.  First, defendants argue that the instructions were misleading because (1) the general issues instruction that stated the factual contentions of the parties relating to the tort count contained no reference that Donovan enjoyed a qualified privilege in acting as a corporate officer and (2) the instruction setting forth the elements of tortious interference with contract did not refer to a "qualified" or "conditional" privilege but stated merely that plaintiff must prove that Donovan acted with "malice."  

We see no prejudicial irregularity in the jury instructions.  In addition to the above instructions, the jury received an instruction that discussed in detail the parameters of a corporate officer's qualified privilege and unequivocally conveyed that a finding that Donovan's actions were not clothed with the qualified privilege was equivalent to a finding that Donovan acted with the "malice" referenced in the elements instruction.  The manifest import of this definitional instruction was that the jury could not find in favor of plaintiff on the tort count without first finding that the qualified privilege did not apply to Donovan's actions.  The failure of the issues instruction to mention the qualified privilege did not introduce confusion and does not warrant reversal.  See 
King v. Clemons
, 264 Ill. App. 3d 138, 143 (1994) ("A reviewing court will not reverse a cause on the basis of an improper instruction unless it is able to conclude that the instruction clearly misled the jury").       

Defendants further claim that the following portion of the definitional instruction on qualified privilege contains a misstatement of the law:

"The Plaintiff may prove 'malice' by showing that the defendant Donovan's interference with Plaintiff's employment contract with RSI was unjustified, which means Donovan acted solely for his own gain or solely for the purpose of harming the Plaintiff, 
and acted contrary to the best interest of the corporation
."  (Emphasis added.)    

Defendants contend that the highlighted clause is contrary to the law.  We agree.  As noted above, a plaintiff wishing to prove that the qualified privilege did not apply to a corporate officer's inducement of a breach of contract need only show that the officer acted solely out of self-interest or solely to harm the plaintiff.  The plaintiff need not plead or prove any specific detriment to the corporation.  Defendants fail to convince us, however, that they were harmed by the inclusion of the additional element in the jury instructions.  Their argument, after all, is that the instructions inappropriately augmented, not diminished, plaintiff's burden of proof.  Plaintiff prevailed on his tort claim despite this heavier burden; we can assume, safely, that he would have prevailed had the unnecessary element not been included.  Therefore, we see no prejudice to defendants.  See 
People v. Alvine
, 173 Ill. 2d 273, 290 (1996) ("An error in a jury instruction is harmless if the result of the trial would not have been different if a proper instruction had been given").

Next, defendants argue that the trial court erred in refusing to redact from the jury's copy of the Agreement the portions relating to retirement benefits.  Defendants argue that the "Agreement's terms regarding the deferred retirement compensation were irrelevant to the matters before the jury and inevitably would lead the jury to infer that the defendants had breached the contract."  We disagree.  The admissibility of evidence is a matter within the sound discretion of the trial judge, whose decision will not be reversed absent a clear abuse of discretion.  
Hilgenberg v. Kazan
, 305 Ill. App. 3d 197, 204 (1999).  We see no abuse of discretion here.  The trial court reasoned, soundly, that the redactions would render the Agreement virtually incomprehensible.  Additionally, the trial court gave clear instructions that the jury was not to consider whether defendants breached the portions of the Agreement pertaining to retirement benefits.  

Next, defendants argue that the court erred in declining to answer the question posed by the jury as to whether Donovan was acting in his official capacity as president of RSI in terminating plaintiff.  Generally, a trial court has a duty to answer a question from the jury that seeks "clarification on a point of law arising from facts about which there is doubt or confusion."  
People v. Millsap
, 189 Ill. 2d 155, 160 (2000).  However, a trial court has discretion not to answer such a question "when the instructions are readily understandable and sufficiently explain the relevant law, where further instructions would serve no useful purpose or would potentially mislead the jury, when the jury's inquiry involves a question of fact, or where the giving of an answer would cause the court to express an opinion that would likely direct a verdict one way or another."  
Millsap
, 189 Ill. 2d at 161.  

The instructions on tortious interference with contract were clear and left no margin for doubt as to how plaintiff could prove that Donovan had acted with "malice."  The trial court, therefore, did not abuse its discretion in refusing to answer the jury's question.  

Next, defendants assert that the trial court did not adequately instruct the jury following plaintiff's attorney's remark during his examination of Donovan that RSI had not yet paid plaintiff any retirement compensation under the Agreement.  Defendants contend that the court's instructions merely "parrot[ed]" the improper remark and "exacerbated" its prejudicial effect when it instructed the jury that the retirement aspects of the Agreement were not relevant to the issues before the jury.  We disagree with this characterization; the trial court did not  remotely parrot or exacerbate any ill effects from counsel's remark.  Rather, the court not only instructed the jury to disregard the comment but also emphasized in clear terms that the issue of whether RSI had failed to pay plaintiff the retirement benefits under the Agreement was not relevant to the issues before the jury.  The admonition and cautionary instruction combined to convey unequivocally that the jury was not to infer from any of the facts in evidence that RSI failed to pay plaintiff his retirement benefits.  See 
In re Estate of Kline
, 245 Ill. App. 3d 413, 431 (1993) (immediate cautionary instruction cured any prejudice from improper remark).  

Next, defendants assert that the trial court erred in denying their motion for judgment notwithstanding the verdict.  Defendants claim there was insufficient evidence to support the jury's finding that Donovan tortiously interfered with plaintiff's contract with RSI.  Defendants argue that the "record amply reflects that [Donovan's] age, health, and his belief that [plaintiff] was disloyal, as well as his belief that the [Agreement] was not an employment contract, were the motivating factors for his actions rather than any specific intent to harm [plaintiff]."  Significantly, defendants do not argue that Donovan did not breach the Agreement.  (In the court below they argued that plaintiff abandoned his employment with RSI, but they have not reasserted that position on appeal.)  They argue, rather, that Donovan was not aware that the Agreement was a contract.  They contend, alternatively, that Donovan was clothed with the qualified privilege in terminating plaintiff because Donovan acted out of neither self-interest nor ill will.  

Plaintiff claims that Donovan acted solely in his self-interest in terminating plaintiff because Donovan and his wife are the sole shareholders of RSI and thus Donovan stood to gain personally from depriving plaintiff of compensation and retirement benefits.  Plaintiff argues in the alternative that Donovan acted solely to harm plaintiff.  Plaintiff claims that Donovan demonstrated ill will in (1) concluding without evidence that plaintiff was responsible for not abating employee discontent that developed after news of the sale leaked; (2) firing plaintiff despite knowing of plaintiff's health problem; and (3) avoiding plaintiff after the sale to Brunswick and using Ridge as a mouthpiece to communicate the demotion and termination. 

A judgment notwithstanding the verdict should not be granted unless the evidence, when viewed in the light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict could possibly stand.  
Kamp v. Preis
, 332 Ill. App. 3d 1115, 1120 (2002).  A judgment notwithstanding the verdict is inappropriate in situations where  reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented.  
Kamp
, 332 Ill. App. 3d at 1120.  A reviewing court must not substitute its judgment for the jury's or reweigh the evidence or determine the credibility of the witnesses.  
Rios v. City of Chicago
, 331 Ill. App. 3d 763, 769 (2002).  A trial court's denial of a motion for judgment notwithstanding the verdict is reviewed 
de novo
.  
Kamp
, 332 Ill. App. 3d at 1120.  

The evidence at trial supports the jury's finding in favor of plaintiff on the tort claim.  While Donovan emphatically denied at trial that he ever believed that the Agreement contained an employment contract, there was evidence that he thought the very opposite when he and plaintiff negotiated the Agreement and, later, when RSI and Brunswick negotiated over whether Brunswick would assume RSI's contractual obligations to plaintiff.  The jury reasonably could have found that Donovan was aware that the Agreement constituted an employment contract.  As to whether Donovan was protected by the qualified privilege in inducing RSI to breach the Agreement (which, as noted above, is the same question as whether Donovan was indistinguishable from RSI for purposes of the tort), Donovan offered two reasons for terminating plaintiff: (1) he considered plaintiff disloyal because plaintiff failed to improve employee morale at RSI after news of the sale leaked; and (2) plaintiff failed to report to RSI on his consulting activities as required and also traveled to Arizona without Donovan's permission.  Donovan, however, never testified that he told plaintiff of the reporting requirement before plaintiff was fired.  Nor was Donovan specific as to how plaintiff failed to curb the poor morale at RSI; he offered only very general attributions of blame. 

   Plaintiff offered evidence challenging Donovan's position. Plaintiff testified that Donovan, in describing to plaintiff the nature of plaintiff's duties under the consulting agreement, stated that plaintiff should do whatever Brunswick asked and "satisfy"  Brunswick.  Plaintiff testified that he was given no further instruction.  Plaintiff specifically denied that he was ever told to report to RSI about his consulting activities.  Plaintiff also testified that his termination was without notice.  Barbera, regional manager for Brunswick, testified that plaintiff was readily available to Brunswick for consulting and provided valuable  advice.  Donovan accepted Barbera's positive assessment of plaintiff's consulting and affirmed that plaintiff was a "critical asset" of RSI.  

The jury reasonably could find, based on this evidence, that plaintiff was a valuable RSI employee whom Donovan fired for no credible reason other than to harm plaintiff.  Therefore, the trial court was correct in denying defendants' motion for judgment notwithstanding the verdict.

    III. Issues Concerning the Award of Punitive Damages

Defendants challenge the award of punitive damages on various grounds.  Plaintiff argues that defendants waived their challenge to the punitive damages award by failing to raise it in their posttrial motion.  We disagree; defendants clearly preserved the issue in their posttrial motion. 

We address first defendants' argument that Donovan's conduct did not warrant an award of punitive damages.  Punitive damages may be awarded "when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others."  
Kelsay v. Motorola, Inc.
, 74 Ill. 2d 172, 186 (1978). Three factors are relevant in assessing an award of punitive damages: (1) the nature and enormity of the wrongdoing by the defendant, (2) the potential liability of the defendant for multiple claims by numerous persons affected by the wrongful conduct, and (3) the financial status of the defendant.  
Hollowell v. Wilder Corp. of Delaware
, 318 Ill. App. 3d 984, 990 (2001). "If the character of the conduct is of the sort that calls for deterrence and punishment over and above that provided by a compensatory award, then it is appropriate to allow a jury to assess punitive damages, subject to the limitation that such an award is not founded on the mere prejudice of the jury."  
Winters v. Greeley
, 189 Ill. App. 3d 590, 599 (1989).  "[P]unitive damages are not favored in the law, and the courts must take caution to see that punitive damages are not improperly or unwisely awarded." 
Kelsay
, 74 Ill. 2d at 188.  An award of punitive damages will not be overturned on appeal unless it is clearly the result of passion, partiality, or corruption.  
Ford v. Herman
, 316 Ill. App. 3d 726, 733 (2000).    

Although the evidence supports a finding that Donovan tortiously interfered with plaintiff's contract, there was no support for a finding that Donovan's conduct was so egregious as to warrant punitive damages.  In other words, plaintiff did not prove any acts of Donovan that exceeded what was necessary to establish the tort itself.  See 
Kritzen v. Flender Corp.
, 226 Ill. App. 3d 541, 554 (1992) ("[C]ourts should award punitive damages only if the defendant's misconduct is above and beyond the conduct needed for the basis of the action").  Plaintiff claims that Donovan's conduct had, in addition to what was necessary to establish the tort, the "flavor of extortion."  Plaintiff suggests that Donovan offered plaintiff the consulting agreement to force him  into the dilemma of either (1) accepting a contract less appealing than the Agreement, or (2) repudiating that offer, thus giving Donovan grounds for claiming that plaintiff abandoned his employment with RSI.  This assertion is purely speculative, as there was no evidence at trial as to how Donovan would have acted had plaintiff declined the consulting arrangement.  Contravening the claim that Donovan employed the consulting agreement to force plaintiff out of RSI was Donovan's testimony, unrebutted by plaintiff, that Donovan went to some lengths to secure health insurance for plaintiff while he consulted with Brunswick.  We vacate the award of punitive damages because the evidence did not warrant any award of punitive damages.

Because we hold that Donovan's conduct did not warrant any award of punitive damages, we do not reach defendants' contention that plaintiff's actuarial evidence concerning the value of the retirement benefits under the Agreement "improperly suggest[ed] that the loss of that value was an item for which the jury should punish the defendants."  Nor do we reach defendants' argument that the trial court erred in admitting evidence and allowing statements at closing argument that inaccurately reflected RSI's financial condition.      

  IV. The Trial Court's Award of Pension Benefits Under the Agreement

 The Agreement guaranteed that, if plaintiff remained in RSI's employ until age 65, he would receive upon his retirement a monthly payment of $7,083.83 for the remainder of his life.  The Agreement provided that if the value of the IRA, projected actuarially from the date of plaintiff's retirement at age 65, was insufficient to provide plaintiff a monthly payment of $7,083.83 for the remainder of his life, then RSI would supply the difference each month.  At the bench trial on the ERISA count, plaintiff called Thomas Doherty, an actuary, to testify as to what amount the IRA would supply each month according to actuarial computations.  According to Doherty, the Agreement provided that the IRA's monthly output is to be projected based on the value of the qualified plan benefits, 
i.e.
, the value of the IRA when plaintiff reached age 65.  The Agreement prescribed the actuarial calculations by which the value  of the qualified plan benefits is translated into the actuarial equivalent value, or the monthly yield.  Doherty explained that the actuarial equivalent value of the IRA is to be computed using the 1994 Male Uninsured Pensioner Mortality Table and 120% of the "applicable interest rate," defined in the Agreement as the interest rate as of the first day of the month that plaintiff reached age 65 (February 2001).  Doherty noted that 120% of the applicable interest rate as of February 1, 2001, was 5.70%.  The IRA's value as of February 28, 2001, was $229,547.  However, Doherty did not calculate the actuarial equivalent value using this figure.  Doherty testified that, because plaintiff had withdrawn certain amounts from the IRA beginning in 1995 following his termination, Doherty thought it appropriate to add these withdrawals back into the IRA for purposes of calculating the actuarial equivalent value.  The withdrawals  were in the following amounts:

Calendar Year IRA Withdrawal 

1995 $2,415 

1996 1,771 

1997 3,797

1998 4,622

1999 5,362

2000 235,000

2001 (YTD: 1/31/01) 50,000.

Doherty testified that he also added back the interest on these withdrawals per the yearly rates of return from 1996 through January of 2001.  The rates were as follows:

Calendar Year Rate of Return

1996  8.63%

1997 35.12

1998 15.75

1999 12.88

2000 -13.16

2001 (YTD: 1/31/01)  3.85.

Using these rates of return, Doherty calculated a total of $300,893 in add-backs, which, added to $229,547 (the value of the IRA as of February 28, 2001), equaled $530,440.  This figure was the value of the qualified plan benefits, Doherty explained.  To calculate the actuarial equivalent value, or the projected monthly payment afforded by the IRA, Doherty used the applicable interest rate, 5.70%, and the Unisex Mortality Table of 1984.  This calculation yielded a projected monthly payment of $4,223.25 over plaintiff's lifetime.  Doherty concluded that RSI owed plaintiff a monthly payment of $2,860.58 over his lifetime to meet the Agreement's guarantee of a monthly payment of $7,083.33.  Next, using a mortality table and further actuarial assumptions, Doherty calculated the total amount of additional compensation that plaintiff would receive over his lifetime.  Doherty calculated this figure to be $391,574.  The trial court awarded plaintiff a lump sum in that amount.   

Defendants challenge Doherty's calculation of the monthly payment on two grounds.  First, they argue that the trial court should not have accepted Doherty's use of add-backs because the Agreement is silent as to add-backs.  A reviewing court will not disturb a trial court's finding as to damages unless its measure of 

damages was erroneous as a matter of law or the trial court ignored the evidence.  
First Baptist Church of Lombard v. Toll Highway Authority
, 301 Ill. App. 3d 533, 543 (1998).  In a breach of contract action, the proper measure of damages is the amount of money that will place the injured party in as satisfactory a position as he would have been in had the contract been performed.  
Equity Insurance Managers of Illinois, L.L.C. v. McNichols
, 324 Ill. App. 3d 830, 837 (2001).  

The add-backs represented amounts that plaintiff testified he withdrew from the IRA to sustain himself and his wife after RSI terminated his employment.  Therefore, they were part of the proper measure of damages.  "In Illinois, parties can limit remedies and damages for breach if their agreement so states and no public policy bar exists" (
Rayner Covering Systems, Inc. v. Danvers Farm Elevator Co.
, 226 Ill. App. 3d 507, 512 (1992)), but here the contract is entirely silent as to the measure of damages available to a party upon breach.  The rights of parties to a contract are limited by the terms expressed in the contract.  
Klemp v. Hergott Group, Inc.
, 267 Ill. App. 3d 574, 581 (1994).  A court will not rewrite a contract to suit one of the parties, but will enforce the terms as written.  
Klemp
, 267 Ill. App. 3d at 581.  There is a strong presumption against provisions that easily could have been included in the contract but were not.  
Klemp
, 267 Ill. App. 3d at 581.  A court will not add another term about which an agreement is silent.  
Klemp
, 267 Ill. App. 3d at 581.  Defendants' argument fails because the Agreement contains no limitation on damages.

Defendants alternatively argue that Doherty improperly calculated interest on the add-backs.  Defendants note that the Agreement defines "qualified plan benefits" as including: 

"(1) All funds contributed to a trust, created or organized by RSI and forming part of RSI's stock bonus, pension, or profit-sharing plan or plans for the exclusive use of its employees or their beneficiaries, that were 
PAID
 to Cress prior to his retirement plus an investment return, computed from date paid through date of retirement, on said paid funds of not less than six (6) percent or the actual amount earned, whichever is greater, 
AND
 (2) all funds contributed to a trust, created or organized by RSI and forming part of RSI's stock bonus, pension, or profit-sharing plan or plans for the exclusive use of its employees or their beneficiaries, that are 
PAYABLE
 to Cress at retirement under any of RSI's past, present, or future stock bonus, pension, or profit sharing plans, excluding employee contributions or earnings on amounts employees contribute to such plans, if any.  Should Qualified plan benefits include funds under which Cress managed or participated in the choice of investment activity for his own account, it is assumed for purposes of computing the amount of Additional Compensation under this Agreement that employer contributions earned an annual investment return of not less than six (6) percent or the actual amount earned, whichever is greater."  (Emphasis in original.) 

Subsection (1) controls here because the benefits at issue were paid to Cress prior to his retirement.  Defendants do not contest  Doherty's calculating the interest on the add-backs by computing each add-back by the corresponding year's rate of return rather than simply totaling the add-backs and multiplying the sum by the average of the rates of return.  Rather, defendants claim that Doherty disregarded the Agreement when he calculated the interest on the add-backs using the actual rates of return for each calendar year that the funds were withdrawn.  Defendants claim that because the Agreement requires that the benefits be calculated with an investment return of "not less than six (6) percent or the actual amount earned, whichever is greater," Doherty erred in not using a rate of return of 6% for 2000 and 2001 where the actual rates of return were less than 6%.  Thus, defendants claim, Doherty understated the value of the IRA and correspondingly overstated defendants' obligation under the Agreement.

Plaintiff argues that the Agreement's requirement of a minimum growth of 6% requires not that each individual year have a rate of return of no less than 6% but that the "overall growth" over the relevant period be no less than 6% per year.  We agree with this interpretation.  The controlling clause  of the Agreement provides that the value of the qualified plan benefits must be calculated with an "investment return *** of not less than six (6) percent or the actual amount earned, whichever is greater."  To determine the intent of this phrase we look to similar phrases elsewhere in the contract, for "[a] contract is to be construed as a whole, giving meaning and effect to every portion thereof, if possible, and not resorting to detached portions thereof standing alone."  
Coles-Moultrie Electric Cooperative v. City of Sullivan
, 304 Ill. App. 3d  153, 159 (1999).  Later in the portion of the Agreement quoted above is a provision requiring that certain of plaintiff's qualified plan benefits be computed with "an 
annual
 investment return of not less than six (6) percent or the actual amount earned, whichever is greater."  (Emphasis added.)  This provision does not control the IRA, but is nonetheless relevant.  In interpreting a contract, a court must give meaning and effect to every part of the contract, including all its terms and provisions, so no part is rendered meaningless or surplusage unless absolutely necessary.  
Coles-Moultrie
, 304 Ill. App. 3d at 159.  We conclude that the word "annual" was included in this later phrase to emphasize that the qualified plan benefits contemplated there are to be calculated separately for each year using that year's actual rate of return, or 6%, whichever is greater, rather than simply adding the benefits together and multiplying the sum by the average of the annual rates of return, or 6%, whichever is greater.  By contrast, because "rate of return" is not qualified by the word "annual" in the provision governing the IRA, we conclude that the latter manner of calculation was intended.  Therefore, under the Agreement, interest on the add-backs is to be calculated by multiplying the sum of the add-backs by the average of the rates of return for years 1996 through 2001 (year to date: January 31, 2001), or 6%, whichever is greater. 

Plaintiff defends Doherty's analysis, but it is not clear to us that Doherty employed the methodology plaintiff espouses.  While Doherty properly construed the Agreement as not requiring that each individual year have a rate of return of not less than 6%, it is not apparent that Doherty multiplied the sum of the add-backs by the average of the rates of return (or 6%, whichever is greater).  He seems instead to have calculated the interest year by year.  We remand this case to the trial court for calculation of the monthly payment owed plaintiff under the Agreement, in accordance with the methodology set forth here.   

Defendants next argue that the trial court's lump-sum award was unauthorized by the Agreement and prohibited under law.  We agree.  The Agreement provides for monthly payments of additional compensation.  There is no provision for a lump-sum payment.  It is well established that where the terms of a contract are clear and unambiguous, they must be enforced as written, and no court can rewrite a contract to provide a better bargain to suit one of the parties.  
Frederick v. Professional Truck Driver Training School, Inc.
, 328 Ill. App. 3d  472, 481 (2002).  Where a  contract implicates an ERISA plan, there is another reason for strictly construing the contract, for to rewrite its terms would be to undermine Congress's aim of ensuring uniformity in the treatment of ERISA plans.  See 
Trujillo v. Cyprus Amax Minerals Co. Retirement Plan Committee
, 203 F.3d 733, 738 (10th
 
Cir. 2000).  Thus, federal courts have maintained that a court is not at liberty to alter the terms of an ERISA plan.  See, 
e.g.
,  
Henglein v. Colt Industries Operating Corp.
, 260 F.2d 201, 215 (3d
 Cir. 2001)  
Trujillo
, 203 F.3d at 738.  

Plaintiff cites no helpful cases.  He relies primarily on 
Burgard v. Mascoutah Lumber Co.
, 6 Ill. App. 2d 210 (1955), which, in fact, was the sole authority the trial court cited to support the lump-sum award.  In 
Burgard
,  the defendant had contracted with the plaintiff to furnish supplies for houses built by the plaintiff.  The plaintiff sought a declaratory judgment of his rights under his account with the defendant.  He alleged that he had overpaid on the account and that defendant had claimed that he had underpaid.  The defendant filed a motion to dismiss the complaint accompanied by an affidavit stating that the parties' agents had already agreed that the defendant was owed $10,536.97.  At the plaintiff's request, the case was tried by a jury, who found for the defendant.  The defendant thereafter filed a petition for further relief and requested that the plaintiff be ordered to show cause why judgment should not be entered against the plaintiff.  In reply, the plaintiff claimed that the trial court had no authority to enter a money judgment because the defendant had never filed a counterclaim for such judgment.  The plaintiff argued that the only relief the defendant could seek was a dismissal of the plaintiff's suit.  The trial court disagreed and entered a judgment for the defendant for $10,536.97.  
Burgard
, 6 Ill. App. 2d at 212-13.    

Affirming the judgment, the appellate court stated that "[i]t is generally held that it is proper to award coercive relief after declaring the rights of the parties, including the entry of a money judgment."  
Burgard
, 6 Ill. App. 2d at 218.  As for the specific issue of whether the money judgment was appropriate despite defendant not having filed a counterclaim for such judgment, the court asserted that a counterclaim need not be filed before a declaratory judgment is entered if the "complaint disclose[s] an actual controversy, 
i.e.
, that defendant opposes the position asserted by plaintiff."  
Burgard
, 6 Ill. App. 2d at 218-19.  

Burgard
 clearly bears little relation to this case.   The trial court cited 
Burgard
 only for the rule that a trial court may order coercive relief, including a money judgment, in granting a declaratory judgment.  But none of the parties claims that the trial court had no authority to enter 
any
 money judgment on the plaintiff's claim for declaratory judgment.  Defendants' claims go to the substantive fairness of the money judgment and the means by which it was computed.  Such issues were not raised in 
Burgard
.      In light of the foregoing, we hold that the trial court erred in awarding a lump-sum payment of retirement compensation.  Since plaintiff turned age 65 on February 7, 2001, and on that date would have become eligible to receive the additional compensation under the Agreement had he remained at RSI, we remand this case to the trial court for an order (1) requiring a lump-sum payment of the total amount of monthly payments of additional compensation that plaintiff has been owed since February 7, 2001, and (2) establishing a schedule for prospective payments of additional compensation per the terms of the Agreement.    

V.  Attorney Fees and Costs; Prejudgment Interest 

A. Attorney Fees

 
 Plaintiff was awarded $354,575 for attorney fees and costs pursuant to 
section 502(g)(1) of ERISA (29 U.S.C. §1132(g)(1) (1994)), which 
permits a court to award "a reasonable attorney's fee and costs of action to either party."  On appeal, defendants raise numerous arguments attacking this award.  They argue that the trial court erred by (1) granting the fee award because, under state law, the evidentiary basis for the attorney fees was inadequate; (2) including attorney fees for work done before an ERISA claim was officially alleged in plaintiff's complaint; (3) accepting plaintiff's vague descriptions of the attorney's work; (4) including time billed by attorney Clifford Yuknis, who worked on the case only before the ERISA claim was added in an amended complaint; and (5) awarding plaintiff attorney fees for enforcing the judgment when the defendants had filed a postjudgment motion.  Defendants also dispute whether certain items should have been taxed as costs and claim that the prejudgment interest award was improper. 

After plaintiff moved for attorney fees, defendants requested, and the trial court ultimately ordered, that plaintiff produce his  attorneys' original time records.  In response, plaintiff's attorney Lawrence Cassano averred in an affidavit that he was unable to produce his original time records, which were described as "preliminary notes on scraps of paper," because they had been destroyed.  He stated that he kept a daily, handwritten time log of the work he performed that was then inputted into a computer that used software to generate a bill for each client.  Plaintiff submitted copies of these bills along with his fees petition as evidence of his attorney fees.

The parties dispute whether the trial court applied the correct evidentiary standard of proof for the attorney fees awarded under ERISA.  Defendants contend that because the state court presided over the attorney fees issue, it should apply Illinois evidentiary standards.  Defendants further maintain that plaintiff's proof of his attorney fees was inadequate under 
In re Marriage of DeLarco
, 313 Ill. App. 3d 107, 116 (2000), which held that the proper admission of computer-generated documents summarizing the originals, such as time slips, required that the original documents either be presented in court or made available to the opposing party.  Plaintiff disagrees, arguing that the attorney fees award was based on a federal statute and, thus, federal law governs the evidentiary decision.

We agree with plaintiff.  We acknowledge the well-established principle that where, as here, an action is based solely upon a federal statute, it must be determined in accordance with federal law.  
Local 174 v. Lucas Flour Co.
, 369 U.S. 95, 102-03, 7 L. Ed. 2d 593, 598-99, 82 S. Ct. 571, 576 (1962).  Moreover, although this court may generally apply Illinois practice and procedure under such circumstances (
Minneapolis & Saint Louis R.R. Co. v. Bombolis
, 241 U.S. 211, 222-23, 60 L. Ed. 961, 965, 36 S. Ct. 595, 598-99 (1916)), state rules must defer to federal law when the local practice would prevent the uniform application of a federal statute (
Local 174
, 369 U.S. at 102, 7 L. Ed. 2d at 598, 82 S. Ct. at 576).

"ERISA, by its explicit language, evinces a strong congressional mandate to preempt State law and regulation of employee benefit plans falling under its purview, and to substitute in its place a uniform Federal common law to govern the administration of such plans.  [Citation.]  This Federal common law would be applicable to all suits brought under ERISA, whether in State or Federal court."  
Solivan v. Commonwealth Edison Mutual Benefit Ass'n
, 146 Ill. App. 3d 285, 289 (1986).  

The federal common law concerning the proper evidentiary foundation to support an attorney fees award instructs us that, in some instances, contemporaneous time records may be required.  
Calhoun  v. ACME Cleveland Corp.
, 801 F.2d 558, 560-61 (1st Cir. 1986).  However, contemporaneous records are not required where the court finds that noncontemporaneous records accurately reflect the amount of time actually expended by counsel.  
Dennis v. Warren
, 779 F.2d 245, 249 (5th Cir. 1985).  For example, an award of attorney fees may be based solely on affidavits in the record.  
Norman v. Housing Authority
, 836 F.2d 1292, 1303 (11th Cir. 1988).  The absence of detailed contemporaneous records is, in an egregious case, grounds for disallowance of an award.  
Grendel's Den, Inc. v. Larkin
, 749 F.2d 945, 952 (1st Cir. 1984).

In the present case, the trial court examined plaintiff's documentation submitted with the fee petition, which included affidavits from counsel, heard testimony at an evidentiary hearing on the petition, and ultimately determined that the evidence submitted by plaintiff was sufficient to support the fees award.  A trial court's decision to award attorney fees pursuant to ERISA will not be disturbed on appeal absent an abuse of discretion.  
Solivan
, 146 Ill. App. 3d at 295.  Here, defendants fail to present facts showing that an abuse of discretion occurred under the governing federal common law.  We, therefore, cannot find an abuse of discretion and affirm the trial court's decision to award the fees. 

Defendants also maintain that the trial court erred by granting plaintiff his full request for attorney fees because plaintiff did not amend his complaint to allege an ERISA cause of action until May 2000, three years after the litigation commenced.  The Supreme Court has held that, when multiple claims for relief are alleged in one lawsuit and the prevailing party is entitled to attorney fees under a federal fee-shifting statute, the court will award all fees spent on claims involving a "common core of facts."  
Hensley v. Eckerhart
, 461 U.S. 424, 435, 76 L. Ed. 2d 40, 51, 103 S. Ct. 1933, 1940 (1983).  Plaintiffs may allege multiple claims for relief but, in most cases, the claims "will involve a common core of facts or will be based on related legal theories."  
Hensley
, 461 U.S. at 435, 76 L. Ed. 2d at 51, 103 S. Ct. at 1940.  Therefore, "[m]uch of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis."  
Hensley
, 461 U.S. at 435, 76 L. Ed. 2d at 51, 103 S. Ct. at 1940.   

In the present case, plaintiff asserted several claims against defendants.  Although plaintiff sought relief under state and federal law, all of his claims were based on the deferred compensation agreement.  This is precisely the type of lawsuit discussed in 
Hensley
, one that involves multiple claims for relief involving a "common core of facts."  As a result, we conclude that the trial court did not err by including in the fees award attorneys' time that was billed prior to the ERISA claim's inclusion in the amended complaint.

We stress that our resolution of this issue does not conflict with our holding that plaintiff's contract and tort claims are not preempted by ERISA.  All of plaintiff's claims rest on the Agreement and, hence, on a common core of facts.  This commonality is not defeated by our holding that the provisions in the Agreement concerning employment compensation operate independently of those pertaining to retirement benefits.    

Our determination of this issue also resolves a related argument raised by defendants.  Defendants assert that the fees billed by Yuknis, one of plaintiff's attorneys, should be disallowed because his work was performed exclusively before the ERISA claim was alleged.  We see no error by the trial court in including Yuknis's time in the fee award.

Defendants challenge the fee award on the additional basis that the "time entries are imprecisely described."  In support of this contention, defendants point to the 46.7 hours billed over a two-month period that Cassano spent performing work described as "trial preparation."  Among the many factors of consideration for the trial court when determining the reasonableness of the number of hours claimed for the litigation is the specificity with which the attorney has described the tasks accomplished during the time charged.  
Trustees of the Four Joint Boards Health & Welfare & Pension Funds v. Penn Plastics, Inc.
, 864 F. Supp. 342, 349 (S.D. N.Y. 1994).  The reasonableness of the fees requested and the amount of the fees to be awarded are decisions left to the trial court's discretion.  
Solivan
, 146 Ill. App. 3d at 295.  

While Cassano's fee records are somewhat vague, we cannot conclude that the trial court erred by including these specific 46.7 hours in the fee award.  Defendants argue that awarding these fees would be improper because on the dates Cassano billed these hours "there had been no firm trial date set."  We do not believe this reason alone is significant enough to upset the trial court's determination that the fees were reasonable.  

Defendants also object to the trial court including in the fees award 1.5 hours of Cassano's postjudgment time that was spent filing citations to discover defendants' assets.  Defendants characterize Cassano's time as "work in attempting to enforce the judgments 
after
 the defendants had filed a post-trial motion."  Defendants do not cite any authority to support their claim that these 1.5 hours should be disallowed.  We find, however, that 
Free v. Briody
, 793 F.2d 807 (7th Cir. 1986), is directly on point.  In holding that ERISA authorizes an award of attorney fees expended to collect a judgment, t
he 
Free
 court indicated that
 "[i]t would make no more sense to deny attorney's fees for efforts to collect a judgment than it would to deny them for efforts to defend a judgment on appeal."  
Free
, 793 F.2d at 809.  We agree and find no error in the court's award of fees related to Cassano's time.

B.  Costs

Defendants also challenge the trial court's order awarding plaintiff $20,566 in costs pursuant to ERISA.  Defendants attack the award on grounds that $9,340.95 of the costs do not have any supporting documentation, costs in the sum of $9,007 were impermissibly awarded for expert witness fees, and $797.79 of the costs were for court reporter fees and medical report copies that plaintiff did not prove were necessarily obtained for use in the case.  

Section 
502(g)(1) of ERISA (29 U.S.C. §1132(g)(1) (1994))
 authorizes the trial court to allow "reasonable attorney's fee and costs of action to either party" in its discretion.  Taxable costs include the following:

"(2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;

(3) Fees and disbursements for printing and witnesses;

(4) Fees for exemplification and copies of papers necessarily obtained for use in the case."  28 U.S.C. §1920(2) through (4) (1994). 

The trial court has broad discretion when making factual evaluations concerning whether an expense is a taxable cost.  
Illinois v. Sangamo Construction Co.
, 657 F.2d 855, 864 (7th Cir. 1981).  If an expense is an allowable cost item, the court's determination that the cost was reasonably necessary to the conduct of the litigation and that the amount of the cost is reasonable will not be upset unless there is a clear abuse of discretion.  
Sangamo
, 657 F.2d at 864.  " 'The losing party must satisfy a heavy burden when asserting that he should be excused from paying costs and affirmatively establish that the costs either fall outside the parameters of [28 U.S.C. §1920 (1994)], were not reasonably necessary to the litigation, or that the losing party is unable to pay. [Citation.]' [Citation.]"  
Gordon v. Castle Oldsmobile & Honda, Inc.
, 157 F.R.D. 438, 440 (N.D. Ill. 1994).

The trial court's costs award included $9,007 for expert fees plaintiff paid to Larimer & O'Connor, who provided actuarial services for plaintiff and whose employee, Thomas Doherty, testified at the bench trial on the ERISA claim.  Defendants argue that plaintiff was not entitled to these costs. 

Absent an applicable statutory provision specifically permitting an award of expert fees, such an award cannot exceed the amount allowed for fact witnesses under 28 U.S.C. §1821 (1994) and 28 U.S.C. §1920 (1994).  
Crawford Fitting Co. v. J.T. Gibbons, Inc.
, 482 U.S. 437, 445, 96 L. Ed. 2d 385
, 393, 107 S. Ct. 2494, 2499 (1987).  ERISA does not expressly permit the taxation of expert fees.  See 
29 U.S.C. §1132(g)(1) (1994)
; 
Holland v. Valhi Inc.
, 22 F.3d 968, 979-80 (10th Cir. 1994)
.  Therefore, expert fees in ERISA cases cannot be taxed in excess of what is permitted under 28 U.S.C. §1821 (1994) and 28 U.S.C. §1920 (1994).  Under 28 U.S.C. §1920(3) (1994), a party may be awarded "[f]ees and disbursements for the printing and witnesses."  The amount of taxable fees for witnesses is limited by 28 U.S.C. §1821(b) (1994) (
West Virginia University Hospitals, Inc. v. Casey
, 499 U.S. 83, 86, 113 L. Ed. 2d 68, 75, 111 S. Ct. 1138, 1140 (1991))
, which provides, "A witness shall be paid an attendance fee of $40 per day for each day's attendance. A witness shall also be paid the attendance fee for the time necessarily occupied in going to and returning from the place of attendance at the beginning and end of such attendance or at any time during such attendance."  
It is improper for a court to assess compensation paid to expert witnesses in excess of these statutory allowances unless exceptional circumstances are present.  
United States v. City of Twin Falls
, 806 F.2d 862, 879 (9th Cir. 1986).  

Plaintiff does not claim that exceptional circumstances are present in this case.  Therefore, we remand this case to the trial court for a determination of an appropriate expert fee in light of 28 U.S.C. §1821 (1994) and 28 U.S.C. §1920 (1994)
.  

As part of the costs taxed against defendants, plaintiff was reimbursed $479.80 for court reporter fees from motion hearings and two depositions and $77.84 for the cost of copying medical reports.  Defendants argue, despite the trial court's conclusion to the contrary, that these expenses do not qualify as taxable costs pursuant to 28 U.S.C. §1920 (1994) because plaintiff did not demonstrate that the expenses were "necessarily obtained for use in the case" as required.  Plaintiff does not argue that these expenses were necessary for the case.  Instead, relying on 
Emmenegger v. Bull Moose Tube Co.
, 33 F. Supp. 2d 1127 (E.D. Mo. 1998), plaintiff maintains that the phrase "reasonable attorney's fee" in section 
502(g)(1) of ERISA (29 U.S.C. §1132(g)(1) (1994)), ERISA's fee-shifting provision
, includes the costs he seeks against defendants.

While acknowledging that the term "costs" in section 502(g)(1) of ERISA is limited to the costs detailed in 28 U.S.C. §1920 (1994), the 
Emmenegger
 court determined that certain out-of-pocket expenses that are not taxable as costs may be recoverable as part of the "reasonable attorney's fee" allowed by ERISA.  
Emmenegger
, 33 F. Supp. 2d at 1133.  It held that, even though the prevailing party included photocopying expenses in the bill of costs, these charges were legitimate out-of-pocket expenses, not taxable as costs, but eligible to be included as part of a  reasonable attorney fee.  
Emmenegger
, 33 F. Supp. 2d at 1134.  We agree with 
Emmenegger
 and determine that plaintiff's $77.84 expense for copying medical reports should be included as part of the reasonable attorney fees of the action.

Defendants also object to the $479.80 for court reporter fees from motion hearings and two depositions that were taxed as costs.  Under 28 U.S.C. §1920 (1994), court reporter fees for all or any part of a stenographic transcript "necessarily obtained" for use in the case are taxable as costs.  "If at the time it was taken, a deposition could reasonably be expected to be used for trial, rather than merely for discovery, it may be included in the costs of the prevailing party."  
Emmenegger
, 33 F. Supp. 2d at 1134.  The evaluation of whether this expense is a taxable cost is a factual determination left to the trial court's discretion.  
Sangamo
, 657 F.2d at 864.  When the trial court determines that a cost was reasonably necessary to the conduct of the litigation and that the amount of the cost is reasonable, we will not disturb that decision unless there is a clear abuse of discretion.  
Sangamo
, 657 F.2d at 864.

The 
Emmenegger
 court did not address whether court reporter fees for depositions and motion hearings may be considered out-of-pocket expenses includable as the attorney fees.  See 
Emmenegger
, 33 F. Supp. 2d at 1134.  Nevertheless, in allowing the court reporter fees to be taxed as costs, the trial court found that these expenses were reasonable and necessary to the case.  Defendants do not cite any authority or facts that suggest that the trial court abused its discretion in making this determination.  On this basis, we find no error for the taxation of the court reporter fees.

Defendants next argue that the majority of the costs taxed, $9,340.95, were improperly awarded because plaintiff did not provide sufficient documentation to substantiate his request.  However, defendants failed to raise an objection on these grounds before the trial court and, thus, are prevented from doing so for the first time on appeal.  
Gradmann & Holler GMBH v. Continental Lines, S.A.
, 679 F.2d 272, 275 (1st Cir. 1982).  As a result, defendants have waived this argument. 

C.  Prejudgment Interest

 In response to defendants' amended posttrial motion, the trial court found that the jury awarded plaintiff for his lost compensation twice, once as damages for the breach of contract and again for the tortious interference with contract.  In its November 8, 2001, order, the court then reduced the jury's award by the amount of lost compensation to avoid a double recovery for plaintiff.
 

The Illinois Interest Act (815 ILCS 205/2 (West 2000)) provides for the award of interest when money is withheld by an unreasonable and vexatious delay of payment.  After judgment was entered in his favor, plaintiff moved the court to award him prejudgment interest on his breach of contract, tortious interference with contract, and ERISA claims.  On May 31, 2001, the trial court awarded plaintiff prejudgment interest on all his claims except for the ERISA claim.  Defendants moved the court to vacate its order granting prejudgment interest after it modified the jury verdict.  The trial court denied the motion.

On appeal, defendants contend that the trial court erred by denying their motion to vacate the prejudgment interest award.  Defendants assert that, when the trial court reduced the jury award to eliminate any double recovery, it vacated the judgment awarding the breach of contract damages but retained the full damages awarded for the tortious interference with contract.  The tortious interference damages were not money owed to a creditor, defendants claim, and, thus, are not subject to prejudgment interest pursuant to the Interest Act.

To recover prejudgment interest under the Interest Act, there must be a fixed and easily calculated amount due from a debtor-creditor relationship that has come into existence by virtue of a written instrument.  
Moody v. First National Bank of Moline
, 239 Ill. App. 3d 986, 990 (1993).  As a general rule, the Interest Act does not allow prejudgment interest for lawsuits based on tort claims.  
Westchester Fire Insurance Co. v. General Star Indemnity Co.
, 183 F.3d 578, 585-86 (7th Cir. 1999); 
Wilson v. Cherry
, 244 Ill. App. 3d 632, 640 (1993).  A trial court's decision to allow prejudgment interest is discretionary and will not be reversed on appeal absent abuse.  
Greenberger, Krauss & Tenenbaum v. Catalfo
, 293 Ill. App. 3d 88, 99 (1997).

Defendants contend that the award of prejudgment interest is improper because it rests exclusively on a tort claim.  They premise their argument on the assumption that the trial court "vacated" the judgment awarding breach of contract damages when it  modified the jury award.  The court's order, however, states otherwise.

In its November 8, 2001, order, the trial court found that "the Jury Verdict on Form A on Count I (Breach of Contract) in the amount of $580,833.41 unlawfully duplicates the jury award of $700,000 on Verdict Form C (Tortious Interference Count) for the value of compensation Mr. Cress lost.  Accordingly, this Court reduces the Jury Verdict by $580,833.41."  Despite defendants' attempt to characterize it otherwise, the court's order states that the jury award was reduced by the amount of plaintiff's lost compensation, not that the court vacated the judgment on the contract claim.  Therefore, the judgment for plaintiff was based on both a contract and a tort claim.  As a result, defendants' argument is without merit, and the trial court did not err by refusing to grant defendants' motion to vacate the award of prejudgment interest.

VI.  Plaintiff's Cross-Appeal

A.  Reduction of the Damages Award

In his cross-appeal, plaintiff contends that the trial court erred by reducing the jury verdict in its November 8, 2001, order.  On verdict form A, the jury assessed damages in the amount of $580,833.41 against RSI for the breach of plaintiff's contract.  Verdict form C concerned plaintiff's tortious interference with contract count against Donovan.  Finding for plaintiff, the jury awarded a total of $2,500,000 in damages.  The jury then itemized the damages and assessed $700,000 for "[t]he value of compensation [plaintiff] lost."  After defendants objected to the verdicts in their amended posttrial motion, arguing that plaintiff received damages for his lost compensation twice, the trial court reduced the jury verdict. 

The determination of damages is generally left to the trier of fact, and a reviewing court will not lightly substitute its opinion for that of the trier of fact.  
Barton v. Chicago & North Western Transportation Co.
, 325 Ill. App. 3d 1005, 1042 (2001).  Although  plaintiffs may plead and prove multiple causes of action, they may obtain only one recovery for an injury.  
Dowd & Dowd, Ltd. v. Gleason
, 181 Ill. 2d 460, 486 (1998).

Plaintiff asserts that the breach of contract and tortious interference claims were separate and distinct because they were alleged against different defendants and the breach of contract count only sought lost compensation for a particular four-year period.  Even though plaintiff may allege multiple theories of recovery, he is limited to a single recovery for a particular injury.  
Dowd & Dowd, Ltd.
, 181 Ill. 2d at 486.  In this case, plaintiff's allegations concern a single contract, his employment agreement with RSI.  He was injured, he claimed, because he did not receive the wages promised in the employment agreement.  The jury's verdicts compensated him for these wages twice.  We agree with the trial court that the jury verdict was duplicative in this regard and that defendants were entitled to the setoff against the judgment in the amount of the lost compensation.

B.  Fees Under the Wage Actions Act

Plaintiff additionally contends that the trial court erred by denying him attorney fees pursuant to the Attorneys Fees in Wage Actions Act (Wage Actions Act) (705 ILCS 225/1 (West 2000)).  The Wage Actions Act allows for the recovery of attorney fees in wage actions when the amount ultimately recovered is no less than the sum the plaintiff demanded in writing at least three days before bringing the lawsuit.  705 ILCS 225/1 (West 2000).  "The statute must be complied with in every particular to entitle the plaintiff to recover attorney fees."  
Caruso v. Board of Trustees of the Public School Teachers' Pension & Retirement Fund
, 129 Ill. App. 3d 1083, 1087 (1984).

After defendants confessed to judgment for violating the Illinois Wage Payment and Collection Act (820 ILCS 115/1 
et seq.
 (West 2000)), the court entered judgment in plaintiff's favor for $16,223.28 plus costs.  The parties do not dispute that plaintiff brought the wage action against defendants in his September 2, 1998, second amended complaint.  However, plaintiff argues that he complied with the Wage Actions Act's requirements in 1997 through an April 30, 1997, letter and during plaintiff's proceedings before the Illinois Department of Labor (IDOL). 

In the April 30, 1997, letter, plaintiff's attorney wrote to defendants' attorney and requested that "[plaintiff's] compensation be immediately returned to its former level" and that "any and all accrued outstanding compensation owing now be paid by RSI, as well."  Contrary to plaintiff's assertion, this letter does not comply with the Wage Actions Act's requirements because it is not a demand for a specific sum from RSI.

Plaintiff also argues that, when he submitted a claim to IDOL for wages due and owing in the amount of $17,223.28, he complied with the Wage Actions Act's requirements.  As support for his argument, he relies on 
Shackleton v. Federal Signal Corp.
, 196 Ill. App. 3d 437 (1989).  In 
Shackleton
, the plaintiff filed a written wage claim with IDOL and the defendant received notice of this claim from  IDOL.  
Shackleton
, 196 Ill. App. 3d at 447.  The 
Shackleton
 court held that the plaintiff sufficiently complied with the Wage Actions Act's statutory notice requirement because "[p]laintiff's compliance with the statutory procedures for collection of wages, in effect, gave notice and demand of the wages due him."  
Shackleton
, 196 Ill. App. 3d at 447.

This same issue was revisited in 
Swanson v. Village of Lake in the Hills
, 233 Ill. App. 3d 58 (1992).  The 
Swanson
 court chose not to follow 
Shackleton
, holding that "[w]e believe a better interpretation of the Attorneys Fees in Wage Actions Act is that it requires the employee to make a written demand 
directly to the employer
 at least three days prior to filing suit for a sum not exceeding the amount found due and owing."  (Emphasis in original.)  
Swanson
, 233 Ill. App. 3d at 68-69.  We agree with the 
Swanson
 court.  The Wage Actions Act should be strictly construed because statutory provisions allowing the recovery of attorney fees are in derogation of the common law.  
Dallis v. Don Cunningham & Associates
, 796 F. Supp. 1127, 1128 (N.D. Ill. 1992).  Therefore, before a plaintiff may recover under the Wage Actions Act, he or she must comply with "every particular" of the statute.  
Caruso
, 129 Ill. App. 3d at 1088.  In the present case, plaintiff did not submit a written demand for a specific sum directly to RSI before he commenced his lawsuit.  As a result, we affirm the trial court's denial of attorney fees pursuant to the Wage Actions Act.

CONCLUSION

In summary, we affirm the trial court's judgment entered on the jury verdict in favor of plaintiff on his claims for breach of contract and tortious interference with contract.  We also affirm the trial court's reduction of the amount of lost compensation awarded plaintiff by $580,833.41.  However, we vacate the award of punitive damages.  We also vacate the trial court's judgment requiring a lump-sum payment representing the total value of additional compensation under the deferred compensation agreement as of February 7, 2001, the date of plaintiff's retirement.  As the Agreement allows only for monthly payments, we remand for an order requiring RSI's deferred compensation plan to pay plaintiff a lump-sum payment representing the total amount of monthly payments owed since February 7, 2001, and establishing a schedule for prospective monthly payments of additional compensation per the terms of the Agreement.  We direct the trial court to determine the amount of the monthly payment owed plaintiff under the Agreement according to the methodology outlined above.     

 
We affirm the trial court's award of attorney fees to plaintiff pursuant to ERISA (29 U.S.C. §1132(g)(1) (2000)).  Regarding which costs were properly taxable under 28 U.S.C. §1920 (1994), we affirm the trial court's determination except for the expenses for the copying of medical records, which were nonetheless  includable as attorney fees, and except for expert witness fees in excess of the fees allowable under 28 U.S.C. §1821 (1994).  We direct the trial court to determine on remand the amount of costs for expert witness fees in accordance with 28 U.S.C. §1821 (1994).  In addition, we conclude that the trial court did not err in denying defendants' motion to vacate the prejudgment interest award or in denying plaintiff attorney fees pursuant to the Wage Actions Act (705 ILCS 225/1 (West 2000)).  

Plaintiff has moved this court for an order directing the trial court to consider his request under ERISA (29 U.S.C. §1132(g)(1) (2000))
 for attorney fees and costs 
incurred after May 17, 2001.  The trial court previously ordered fees and costs  through May 17, 2001, the date of its order.  We hereby grant plaintiff's motion and direct the trial court to consider plaintiff's request for attorney fees and costs incurred on the ERISA-related part of this litigation after May 17, 2001.

For the foregoing reasons, we affirm in part and reverse in part and remand this cause for further proceedings consistent with this opinion. 

Affirmed in part and reversed in part; cause remanded.

GROMETER and CALLUM, JJ., concur.