2021 IL App (1st) 200205

SIXTH DIVISION
May 21, 2021

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

No. 1-20-0205

| | | |
|---|---|---|
| UNCLE TOM'S, INC., n/k/a Market Square Restaurant, Inc., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant and Cross-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | No. 2011 CH 39924 |
| LYNN PLAZA, LLC, | ) | |
| | ) | |
| Defendant-Appellee and Cross-Appellant. | ) | Honorable |
| | ) | Sophia Hall, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justices Connors and Harris concurred in the judgment and opinion.

**OPINION**

¶ 1    This landlord and tenant dispute comes to us on appeal from judgments entered in favor of

the defendant landlord on the parties' various cross-motions for summary judgment and following

a trial on the two remaining counts. The plaintiff, Uncle Tom's, Inc. (Tom's),[1] has for many years

operated the Market Square Restaurant, located in a strip mall owned by the defendant, Lynn Plaza,

LLC (Lynn Plaza).[2] The relationship, which appears to have been an amicable one for many years,

_____

[1]The company is apparently named after its former president, Tom Pappas, who died in 2015, and
has been renamed Market Square Restaurant, Inc.

[2]The lessor on the original lease was a land trust owned by the Kolodny family. In 1996 they formed
Lynn Plaza, a limited liability company that succeeded to that interest.

began to deteriorate as the parties' 35-year lease was set to expire and they found themselves unable to agree on the terms of a 15-year extension. Tom's sued for a declaration resolving that issue and, at the same time, challenged certain categories of the common area maintenance (CAM) costs it had been paying for a number of years under the parties' lease. While this litigation was pending, Lynn Plaza filed a forcible entry and detainer action alleging that Tom's was in violation of the lease for offering video gaming, which had recently been legalized in Illinois. That action was stayed, and Tom's was granted leave to include additional counts for declaratory relief on whether video gaming violated the lease in this case.

¶ 2     The issues before us on the parties' appeal and cross-appeal are (1) the propriety of the challenged CAM charges, (2) whether video gaming violates the parties' lease, and (3) whether Lynn Plaza is entitled to attorney fees as a prevailing party in this litigation.

¶ 3                                 I. BACKGROUND

¶ 4                         A. The Parties' Lease and Course of Dealing

¶ 5     On March 2, 1978, Tom's, as lessee, entered into a 35-year ground lease with the original lessor, Amalgamated Trust & Savings Bank (as trustee under Trust No. 2213), for a parcel of unimproved land at the corner of a strip mall known as the Lynn Plaza Shopping Center, located at 600 W. Dundee Road in Wheeling, Illinois. A year later, Tom's erected a structure on the property that it has since operated as the Market Square Restaurant. A number of the provisions of the original lease are relevant to the parties' dispute and to this appeal.

¶ 6     Section 1, titled "Demised Description and Use of Premises" and referred to by the parties as the lease's "purpose clause," stated that the property was leased "for the purposes of conducting thereon a restaurant and liquor lounge business and for no other purpose." Section 12 further contemplated that a one-story "restaurant and cocktail lounge building" would be constructed on

the premises that would "seat approximately 210 people." Section 5, titled "Waste and Nuisance Prohibited," required Tom's to both "comply with all applicable laws affecting the demised premises" and refrain from "commit[ting] or suffer[ing] to be committed any waste on the demised premises or any nuisance." Section 8 forbade Tom's from subletting the premises or assigning or transferring any of its interest in the leasehold without Lynn Plaza's prior written consent.

¶ 7    Section 32 of the lease obligated Tom's to pay, "as additional rent," a 10% *pro rata* share of CAM costs—defined as the "cost of maintaining and operating all areas and facilities *** provided and designated by [Lynn Plaza] for the general use and convenience of [Tom's] and tenants of the Shopping Center." Common areas included a portion of the shopping center's parking lot located beneath power lines owned by Commonwealth Edison (ComEd) that the center leased from ComEd; "ingress and egress to the said Shopping Center and to the demised premises; [and] driveways and walkways." The CAM costs associated with such areas were to "include, but not be limited to, labor, supplies, equipment, and all expenses of repairing, leasing cleaning [*sic*], sweeping, snow removal, painting of parking lines and signs, public liability insurance, policing, lighting, landscaping and decorating the common facilities, and of removing trash, garbage, and other waste therefrom." Section 32(c) of the lease also provided that "[u]nder no circumstances [could Lynn Plaza] charge [Tom's], its customers and employees any fees for parking" and made clear that Lynn Plaza "shall not be entitled to any fee or expense for the management of the common area funds."

¶ 8    Lynn Plaza only began including property management fees in the CAM costs it charged to Tom's in 1997. The CAM statement for that year, issued in early 1998, included a $15,698 charge for management fees, accompanied by the following note: "Property management is an expense allowed under the common area provision of your lease which previously has not been

included in your CAM charges."

¶ 9    The record reflects that charges associated with Lynn Plaza's rental of an easement from ComEd for the shopping center's parking lot was included in CAM statements sent to Tom's since at least 1989.

¶ 10    In connection with a loan sought by Lynn Plaza, in or about July 1998, Tom's was asked to execute a "Tenant Estoppel Certificate" representing to the proposed lender that rent had been "paid through July 1998" and that there were "no defenses to or offsets against the enforcement of the Lease or any provision thereof by the Landlord." The certificate was executed by Tom's principal, Tom Pappas.

¶ 11                    B. The Introduction of Video Gaming

¶ 12    In 2009, the General Assembly enacted the Video Gaming Act (Act) (230 ILCS 40/1 *et seq.* (West 2018)), which legalized the use of video gaming terminals within certain licensed establishments, including bars, fraternal and veterans' establishments, and truck stops. A video gaming terminal is defined under the Act as "any electronic video game machine that, upon insertion of cash, electronic cards or vouchers, or any combination thereof, is available to play or simulate the play of a video game, including but not limited to video poker, line up, and blackjack," and through which a player "may receive free games or credits that can be redeemed for cash." *Id.* § 5. A licensed establishment under the Act is "any licensed retail establishment where alcoholic liquor is drawn, poured, mixed, or otherwise served for consumption on the premises, whether the establishment operates on a nonprofit or for-profit basis." *Id.*

¶ 13    The Act places numerous restrictions on the operation of video gaming terminals in licensed establishments. Terminals must be approved by the Illinois Gaming Board (Board) and are subject to ongoing testing by licensed third parties. *Id.* § 15. They must conform to an approved

model, meet a lengthy list of criteria governing their construction and operation, include accounting software that keeps electronic records, and be linked by a central communications system for auditing purposes. *Id.* The Act specifies the form and method of dispensing payouts, the cost of credits, and maximum wagers. *Id.* § 20. It requires licensed establishments to post the odds of winning on or near each terminal, limits play to the legal hours of operation allowed for the consumption of alcoholic beverages, and restricts play to users who are over the age of 21. *Id.* §§ 35, 40. For most of the relevant time period, the maximum number of video gaming terminals allowed in a licensed establishment was five. *Id.* § 25(e). In 2019, the maximum number was raised to 6, except for larger truck stops, which may have 10 terminals. Pub. Act 101-31, § 35-60 (eff. June 28, 2019) (amending 230 ILCS 40/25). 230 ILCS 40/25(e) (West Supp. 2019).

¶ 14    Every entity involved in the process of manufacturing, distributing, operating, hosting, and servicing video gaming terminals must be licensed by the Board and is prohibited from possessing multiple types of licenses under the Act. 230 ILCS 40/25, 30 (West 2018). A licensed establishment must enter into a written use agreement with a licensed operator for the placement of terminals in its facilities. *Id.* § 25(e). The operation of video gaming terminals outside the parameters established by the Act is considered a violation of section 28-3 of the Criminal Code of 2012, which, subject to exceptions, generally prohibits gambling within the state (720 ILCS 5/28-3 (West 2018)). 230 ILCS 40/35(a) (West 2018).

¶ 15    Pursuant to the Act, the Board has adopted regulations that, among other things, outline the duties and obligations of video gaming terminal operators and video gaming locations (11 Ill. Adm. Code 1800.250 (2019); 11 Ill. Adm. Code 1800.270 (2016)) and control the location and placement of video gaming terminals (11 Ill. Adm. Code 1800.810 (2018)). Pursuant to these regulations, licensed establishments serving patrons under the age of 21 must place video gaming

terminals in a designated area that is within view of the establishment's employees and cordoned off by a "short partition, gate or rope or other means of separation." *Id.*

¶ 16    Except where prohibited by a local municipality, the Board began issuing video gaming licenses to licensed liquor establishments in October 2012. Tom's was approved for a license, and in March 2014, five video gaming terminals were placed in the Market Square Restaurant by licensed video gaming operator Leisure Time Gaming and Amusement, Inc. (Leisure Time).

¶ 17                              C. History of This Litigation

¶ 18                              1. Dismissal of Count I

¶ 19    The initial term of the parties' lease was set to expire in 2013, but in 2005, Tom's exercised its option to extend the lease another 15 years, or until August 31, 2028. The parties could not agree on the square footage to be included in the rent calculation for the option extension, however, and on November 18, 2011, Tom's filed a complaint seeking a declaration resolving that dispute. Tom's also sought an equitable accounting, on the basis that it had "discovered discrepancies and other questionable charges" in the CAM costs assessed against it by Lynn Plaza. Tom's alleged that Lynn Plaza had, among other things, "improperly included clerical items in CAM charges," "improperly included ground rental and easement charges in CAM," and, upon information and belief, "improperly charged [Tom's] for management of the common area funds" and "overbilled [Tom's] for 'management fees.' " Lynn Plaza moved to dismiss the complaint, and the circuit court granted the motion in part, agreeing with Lynn Plaza's reading of the lease on the amount of rent to be paid during the option period but denying the motion with respect to the CAM charges.

¶ 20                              2. Summary Judgment on Count II

¶ 21    On December 23, 2013, Tom's moved for partial summary judgment, arguing that Lynn Plaza improperly included management fees and the cost of leasing the ComEd right-of-way used

for parking as part of the CAM costs it charged to Tom's.

¶ 22    In response, and in support of its cross-motion for summary judgment, Lynn Plaza submitted the affidavit of Michael Kolodny, vice president of the shopping center's property management company, who explained that pursuant to section 32 of the parties' lease, each year Tom's was billed for, and paid, 10% of the CAM costs for the shopping center. Lynn Plaza issued Tom's an annual reconciliation invoice reflecting the difference between the actual CAM costs for the prior calendar year and the estimated monthly installment payments Tom's had made over the course of that year. Mr. Kolodny averred that, following receipt by Tom's of Lynn Plaza's January 20, 1998, reconciliation invoice for 1997 CAM costs, he received a letter, attached to his affidavit and dated January 27, 1998, from an attorney representing Tom's, who objected to inclusion of the property management fees. Mr. Kolodny wrote back on February 2, 1998, advising the attorney that "[t]he fee charged was for property management, not for managing common area funds" and was thus properly included in the assessed CAM costs. According to Mr. Kolodny, Tom's thereafter paid the withheld amounts.

¶ 23    Tom's took the same position the following year, with the same outcome. In 2000, however, it "simply deducted an amount it objected to paying from its CAM payment," causing Lynn Plaza to issue a five-day notice demanding that it pay the outstanding amount or face eviction. According to Mr. Kolodny, upon receiving the notice, Tom's paid the full amount owed without protest.

¶ 24    The trial court in this case granted summary judgment in favor of Lynn Plaza with respect to count II, concluding on June 20, 2014, that ComEd leasehold charges were properly included as CAM costs under section 32(c) of the parties' lease and further concluding on December 12, 2014, that Tom's was estopped from challenging the property management fees it had been

charged since 1997 by the July 1998 estoppel certificate it had signed. Tom's moved for reconsideration of those rulings and its motions were denied.

¶ 25                                    3. The Forcible Entry and Detainer Action

¶ 26    On March 27, 2014, during briefing on the summary judgment motions, Lynn Plaza issued a notice of default advising Tom's that its use of the leased premises for gambling violated the purpose clause of the lease and directing Tom's to stop offering video gaming within 30 days. Lynn Plaza sent a second notice on April 7, 2014, this time asserting that the contract between Tom's and Leisure Time constituted an impermissible sublease or assignment under the lease. When Tom's did not comply with the notice, Lynn Plaza filed a forcible entry and detainer action. Tom's was granted leave to amend its complaint in this matter to include counts III and IV, seeking declarations in its favor on both issues, and the forcible entry and detainer action was then stayed pending the outcome of this case.

¶ 27    The court reserved ruling on the parties' cross-motions for summary judgment on these new counts, and they were ultimately the subject of a two-day bench trial in May 2016.

¶ 28                                    4. The Bench Trial on Counts III and IV

¶ 29    The issues before the court in the bench trial were whether video gaming violated the purpose clause of the parties' lease (count III) and whether the agreement Tom's entered into with its video gaming vendor constituted an unauthorized sublease or assignment of Tom's rights under the lease (count IV).

¶ 30    Sam Pappas, President of Tom's (now Market Square Restaurant, Inc.), testified that in 1978 when the ground lease at issue was signed, the property in question consisted of 15,300 square feet of vacant land. Tom's subsequently constructed a 5889-square-foot building on the property that Mr. Pappas's family had operated as a restaurant and liquor lounge for 36 years. The

restaurant could seat approximately 250 people. Mr. Pappas estimated that the video gaming area comprised less than 2.5% of the restaurant's total area.

¶ 31    Mr. Pappas testified that pursuant to the exclusive location agreement Tom's entered into with Leisure Time, Tom's could place the video gaming terminals within the restaurant as it saw fit, Leisure Time did not have a key to the Market Square Restaurant, and, by signing the agreement, Tom's had not intended to sublease any part of the real estate to Leisure Time. Tom's had no access to the inner workings of the terminals. Leisure Time came three times a week to service the terminals and issued Tom's a report of gaming activity and a check for its share of the video gaming profits twice a month. Tom's was legally required to install a railing around the area, and individuals under the age of 21, including employees of the restaurant, were not allowed to pass beyond the railing.

¶ 32    Mr. Pappas testified that Stella's, another establishment in the Lynn Plaza shopping center, offered video gaming and was located 200-300 feet away from the Market Square Restaurant.

¶ 33    Mr. Pappas said that about three or four years prior, while meeting with Michael and Jeffrey Kolodny "[t]o try to come to terms on a lease," he had mentioned that Tom's had an interest in offering video gaming to patrons of the Market Square Restaurant, and the Kolodnys had offered no response. According to Mr. Pappas, Tom's had installed other types of revenue-generating machines in the past—including cigarette machines, candy and gumball machines, claw cranes with toy prizes, and a pay phone—all requiring various licenses from the village or state, and Lynn Plaza had never objected to the presence of those machines. According to Mr. Pappas, video gaming, while an additional source of revenue, also created additional expenses for the restaurant. The restaurant stayed open later and had expended money for permits and advertising.

¶ 34    On cross-examination, Mr. Pappas acknowledged that a "bright red neon sign" advertising

video gaming at the Market Square Restaurant was about the same size as the restaurant's "open" sign. He agreed that the restaurant had never installed a similar sign advertising any of its other revenue-generating machines and had never changed its hours to make better use of those machines. Tom's had a permit from the Village of Wheeling that allowed it to display a banner advertising video gaming four times a year for 28 days. Mr. Pappas agreed that, since it began offering video gaming, the restaurant's food and beverage sales had declined "a little bit," but that income for the overall business had gone up.

¶ 35    Robin Ferrari, a representative of Leisure Time, testified that video gaming machines went "live" at the Market Square Restaurant in March 2014. The parties' use agreement was for five years, or until March 2019, but would be automatically renewed unless Tom's indicated that it did not wish to renew. Mr. Ferrari explained that activity for the gaming terminals is transmitted in real time to a data vendor approved by the Board and that revenue from the terminals is divided, with the state taking 30%, a small administration fee of less than 1% going to the data vendor, and the remainder divided equally between the terminal operator and the licensed establishment. Twice a month, Leisure Time sends each licensed establishment it has an agreement with a check for its share of profits and a report showing this breakdown.

¶ 36    On cross-examination, Mr. Ferrari acknowledged that video gaming is still not legal in a substantial number of municipalities, including Chicago. Mr. Ferrari agreed with defense counsel that an establishment must apply for a separate video gaming license and is not automatically licensed to host video gaming terminals simply by virtue of its liquor license. He further agreed that video gaming is a "heavily regulated" business.

¶ 37    On January 13, 2017, the trial court found in favor of Lynn Plaza on count III, concluding that the operation of video gaming terminals was inconsistent with and violated the purpose clause

of section 1 of the parties' lease. The court found in favor of Tom's on count IV, however, finding that its agreement with Leisure Time did not constitute a sublease or assignment of leasehold rights in violation of section 8(c) of the lease. Only the ruling on count III is at issue in this appeal.

¶ 38                                    5. Lynn Plaza's Fee Petition

¶ 39    Lynn Plaza's request for an award of attorney fees as a prevailing party under section 17 of the parties' lease was the subject of substantial posttrial briefing. In a series of orders, the trial court ultimately denied Lynn Plaza's request for fees under count I but awarded it a total of $198,484.50 under counts II-IV. The court set out the basis for this award in a written decision on September 29, 2017. It explained that although Lynn Plaza had successfully moved to dismiss count I—concerning the appropriate square footage to be used for rent calculations during the 15-year option period—it was entitled to no fees on that count because "a declaratory judgment action is a statutory proceeding" and not "an action at law or equity." The court ruled that count II, seeking an equitable accounting, came within section 17 of the lease, and Lynn Plaza was entitled to reasonable attorney fees under that count. And the court was persuaded that Lynn Plaza was also entitled to fees under counts III and IV. Although those counts, like count I, were for declaratory relief, they were essentially arguments made by Tom's in response to Lynn Plaza's forcible entry and detainer action, which the court viewed as "an action at law" also falling under the purview of section 17 of the lease. The court explained that although Lynn Plaza was granted summary judgment on count III and Tom's was granted summary judgment on count IV, Lynn Plaza was still the prevailing party. The two counts simply presented different arguments in response to a single claim for violation of the lease.

¶ 40    The parties' motions to reconsider these rulings were denied, and this appeal followed.

¶ 41                                                    II. JURISDICTION

¶ 42    Tom's appeals from the circuit court's June 20 and December 12, 2014, orders granting summary judgment to Lynn Plaza on count II and the court's January 13, 2017, judgment in Lynn Plaza's favor following a trial on counts III and IV. Tom's also appeals from the court's September 29, 2017, July 8, 2019, and September 6, 2019, orders awarding Lynn Plaza legal fees. Lynn Plaza appeals from that portion of the September 29, 2017, order denying it attorney fees under count I. The court denied the parties' last motions to reconsider these rulings on January 13, 2020. Tom's timely filed its notice of appeal on January 30, 2020, and Lynn Plaza timely filed its notice of cross-appeal on February 5, 2020. We have jurisdiction over this appeal pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), governing appeals from final judgments entered by the circuit court in civil cases.

¶ 43                                                    III. ANALYSIS

¶ 44    On appeal, Tom's seeks reversal of the trial court's orders granting summary judgment in favor of Lynn Plaza on count II, in which the court concluded that the parties' lease allowed Lynn Plaza to include two categories of disputed expenses—property management fees and the rent Lynn Plaza paid for a ComEd easement—as CAM costs for which Tom's was responsible for contributing a 10% *pro rata* share. Tom's also seeks reversal of the court's judgment in favor of Lynn Plaza following a bench trial on count III, in which the court concluded that video gaming violated the purpose clause of the parties' lease. Both sides take issue with the trial court's award of fees to Lynn Plaza as the prevailing party in this litigation. We consider each issue in turn.

¶ 45                                                    A. CAM Charges

¶ 46    In count II of its complaint, Tom's alleged that Lynn Plaza improperly included property management fees and the cost of leasing an easement from ComEd in the CAM costs Tom's was

responsible for paying 10% of under section 32(c) of the parties' lease. The trial court entered summary judgment in Lynn Plaza's favor for both categories of charges. We review a trial court's ruling on a motion for summary judgment *de novo*. *Luise, Inc. v. Village of Skokie*, 335 Ill. App. 3d 672, 678 (2002).

¶ 47    With respect to the first category, Tom's argues on appeal that case law prohibits courts from reading into the terms of a lease an obligation to pay property management fees, that language in the parties' lease specifically prohibited Lynn Plaza from assessing "any fee or expense for the management of the common area funds," and that Tom's was never charged management fees during the first 18 years of the lease. In response, Lynn Plaza argues that property management fees are allowable as a cost of operating the property, that such fees are different from fees assessed for the management of funds, and that once Tom's initial objections to the fees was addressed, it had paid the management fees every year since Lynn Plaza began assessing them.

¶ 48    With respect to the costs associated with leasing the easement from ComEd for the shopping center's parking lot, Tom's argues on appeal that these are land-use acquisition costs, not costs associated with "maintaining and operating" the shopping center's common areas; that such payments are not specifically included in a list of CAM costs appearing in section 32(c) of the lease; that the lease specifically states that Lynn Plaza may not charge Tom's any fees for parking; and that the parking lot in question has since been leased to a car dealership located across the street from the shopping center. In response, Lynn Plaza notes that the shopping center's common area is defined by the lease to expressly include "the adjacent Commonwealth Edison right of way (under lease to Lessor) used for parking purposes"; that section 32(c)'s illustrative list of CAM costs that might be assessed does indeed include costs related to "leasing"; that such charges do not constitute "fees for parking"; and that the arrangement with the car dealership is

for nonexclusive use of only a portion of the parking lot at issue.

¶ 49    Lynn Plaza also argues that Tom's is estopped from challenging either of these charges because it executed a tenant estoppel certificate in July of 1998 in which it stated that it had "no defenses to or offsets against the enforcement of the Lease or any provision thereof by [Lynn Plaza]," thus estopping it from later challenging any charges it had been charged and was aware of on that date.

¶ 50    The trial court concluded in a handwritten order entered on June 20, 2014, that the ComEd leasehold charges were properly assessed as CAM costs. We need not reach that issue, however, because we agree with the court's later ruling, on December 12, 2014, that by executing the July 1998 tenant estoppel certificate, Tom's was estopped from challenging CAM charges it was aware of on that date. Although the trial court made this finding of estoppel only with respect to the property management fees, we may affirm on any ground supported by the record (*Ultsch v. Illinois Municipal Retirement Fund*, 226 Ill. 2d 169, 192 (2007)), and we agree with Lynn Plaza that the argument applies equally to the ComEd leasehold charges. The record reflects that Tom's received a 1997 CAM reconciliation statement assessing property management fees on January 20, 1998, six months before it signed the tenant estoppel certificate. And it had received statements assessing the ComEd leasehold charge for almost a decade before that.

¶ 51    As we have recognized:

>        "An estoppel certificate is a signed statement by a party, such as a landlord, certifying for another's benefit that certain facts pertaining to the tenancy are correct. [Citation.] Estoppel certificates are widely used in commercial real estate transactions and are important in preserving and enhancing the marketability of commercial property. [Citation.] A party's delivery of this statement estops that party from

- 14 -

later claiming a different state of facts. [Citation.] A purpose of an estoppel certificate is to give assurance that the party making the estoppel statement at a later date will not make claims that are inconsistent with the statements contained in the estoppel [certificate]. [Citation.] Moreover, [a] party who executes an estoppel certificate will not be allowed to raise claims of which it knew or should have known at the time the certificate was executed." (Internal quotation marks omitted.) *Urban Sites of Chicago, LLC v. Crown Castle USA*, 2012 IL App (1st) 111880, ¶ 26.

¶ 52    The arguments Tom's raises against a finding of estoppel are the same ones that were rejected by the trial court. We find them equally unpersuasive. As an initial matter, we reject its argument that, absent a showing that the elements of equitable estoppel were met, a finding of estoppel was improper. A claim of equitable estoppel exists where a person's statements or conduct induce a second person to reasonably rely, to his or her disadvantage, on the statements or conduct. *Guarantee Trust Life Insurance Co. v. Platinum Supplemental Insurance, Inc.*, 2016 IL App (1st) 161612, ¶ 40. Notably, fraud is an essential element of equitable estoppel; "[w]ithout the misrepresentation or concealment of a material fact," the doctrine does not apply. *Parks v. Kownacki*, 193 Ill. 2d 164, 180 (2000). The trial court's finding of estoppel in this case was not based on any allegation of fraud but on Tom's execution of the estoppel certificate.

¶ 53    Tom's points out that the estoppel certificate, which does not specifically mention the CAM charges at issue, cannot be read to bar challenges to those charges. We disagree. Section 32(c) of the parties' lease makes clear that Tom's *pro rata* share of CAM costs is assessed against it "as additional rent" under the lease. By executing the estoppel certificate, Tom's was certifying that "[t]here [were] no defenses to or offsets against the enforcement of the Lease *or any provision thereof* by the Landlord." (Emphasis added.) Any legal justification Tom's had for not paying the

disputed charges, including any claim that Lynn Plaza had violated the lease by assessing unauthorized charges, was just the sort of defense or offset against the landlord's enforcement of the lease that the lender was attempting to uncover by requiring the certificate. We agree with Lynn Plaza that just because the tenant estoppel certificate "did not contain an exhaustive list of every provision of the lease with which Lynn Plaza was in compliance does not alter the clear language used in that document."

¶ 54    Tom's next argues that because the certificate "speaks only to *prior* rent and then-*current* (1998) circumstances," it cannot estop Tom's from challenging CAM charges assessed against it after July 1998. The trial court rejected this argument, finding that, for charges Tom's knew it was incurring, its assertion in the certificate that it had no defense to Lynn Plaza's enforcement of the lease prevented it from taking a different position later. We agree with this assessment.

¶ 55    And although we agree with Tom's that *K's Merchandise Mart, Inc. v. Northgate Ltd. Partnership*, 359 Ill. App. 3d 1137 (2005), is in many ways factually similar to this case, Tom's ignores the important difference between that case and this one, which is that there the tenant was unaware that any significant additional CAM charges had been assessed when it signed the estoppel certificate. We held in *K's Merchandise* that a tenant was not barred from challenging the management fees assessed by its shopping center landlord because "the events prior to the execution of the estoppel certificate did not rise to the level that [the tenant] should reasonably have known of the management fee." *Id.* at 1145. Although one CAM reconciliation received before the estoppel certificate was executed contained a line item for a management fee, it did not explain that the management fee would be fairly significant—5% of the shopping center's gross revenue from all tenants. *Id.* at 1144. Because the fee was assessed for only two months that year, the amount of the line item, approximately $300, may have seemed insignificant to the tenant. *Id.*

at 1144-45. And the tenant received the statement just a few months before it was required to sign the estoppel certificate. *Id.* at 1145. Under all of these circumstances, the court felt the tenant should be excused from conducting any sort of extensive inquiry into the nature of the charge. *Id.*

¶ 56 We agree with Lynn Plaza that the missing element prohibiting a finding of estoppel in *K's Merchandise*—the tenant's contemporaneous knowledge of the significance of the disputed charge at the time it executed the estoppel certificate—was in fact present here. As noted above, ComEd leasehold charges had appeared on the itemized CAM statements Lynn Plaza sent Tom's for almost a decade before the estoppel certificate was signed. And although the first appearance in such statements of a property management fee occurred, as in *K's Merchandise*, not long before the certificate was signed (six months here, compared to just three in *K's Merchandise*), here the charge was flagged with a notation calling it to Tom's attention. The 1997 CAM costs were also set out side-by-side next to the itemized charges for the previous year, making it quite clear that property management fees were being assessed for the first time.

¶ 57 Of even greater import, however, are Mr. Kolodny's unrebutted affidavit and the parties' correspondence in January and February of 1998, which clearly establish that Tom's not only knew about the management fees but had engaged an attorney who disputed the new charges in writing and received an explanation for their inclusion in the CAM costs. Unlike the tenant in *K's Merchandise*, Tom's clearly viewed the management fees it was charged as significant enough to investigate, Tom's did in fact investigate those charges, and Tom's accordingly knew what it was being charged when it executed the estoppel certificate. Tom's is thus estopped from challenging the imposition of property management fees or ComEd leasehold charges.

¶ 58 Because we agree with the trial court's assessment of the effect of the estoppel certificate in this case, we need not reach Lynn Plaza's alternative argument that Tom's is barred by the

doctrine of laches from challenging the disputed charges. The trial court's grant of summary judgment in favor of Lynn Plaza on count II is affirmed.

¶ 59                    B. Whether Video Gaming Violated the Parties' Lease

¶ 60    Tom's also argues that the trial court's judgment in favor of Lynn Plaza on count III—in which the court concluded that the operation of video gaming terminals violated the purpose clause of the parties' lease—should be reversed. Tom's makes a host of legal, factual, and policy based arguments in favor of this result on appeal. However, we agree with Tom's that the lease itself does not prohibit, and therefore permits, the video gaming terminals that Tom's allowed to be operated on the premises.

¶ 61    A lease is a contract between a landlord and a tenant to which we apply ordinary principles of contract interpretation. *Midland Management Co. v. Helgason*, 158 Ill. 2d 98, 103 (1994). A court's principal objective in construing such a document is "to determine and give effect to the intention of the parties at the time they entered into the contract." *Village of Palatine v. Palatine Associates, LLC*, 2012 IL App (1st) 102707, ¶ 45. We "look to the instrument itself, its purpose and the surrounding circumstances of its execution and performance." *Id.* Terms used in a contract are to be given their ordinary and natural meaning, considered in the context of the lease as a whole. *Owens v. McDermott, Will & Emery*, 316 Ill. App. 3d 340, 344 (2000). "If an uncertainty arises concerning the meaning of [those] terms, then the lease should be construed in the lessee's favor and against the lessor." *Clarendon America Insurance Co. v. Prime Group Realty Services, Inc.*, 389 Ill. App. 3d 724, 729 (2009). Where construction is a matter of law, our standard of review is *de novo*, and we may interpret the contract independently of the trial court's judgment. *Pennsylvania Life Insurance Co. v. Pavlick*, 265 Ill. App. 3d 526, 529 (1994).

¶ 62    Here, the so-called "purpose clause," found in section 1 of the parties' lease, states that the

property was leased "for the purposes of conducting thereon a restaurant and liquor lounge business and for no other purpose." Tom's primary argument is that, although the parties may not have foreseen the introduction, years later, of a technology like video gaming when this language was drafted in 1978, the fact that they entered into a lease capable of being in force 50 years later indicates that they intended a flexible, rather than a rigid, definition of "liquor lounge business." In other words, they did not envision a business that would stand still in time, forever conforming to the norms of the 1970s. Following passage of the Video Gaming Act, liquor lounge businesses in Illinois may now, where not locally prohibited, seek licensure to offer their patrons access to a limited number of video gaming terminals. Many of them do. And they are all still liquor lounge businesses.

¶ 63    Tom's faults the trial court for treating the lease's purpose clause as a specific *use* restriction. Although the word "use" does appear in the caption for section 1—"Demised Descriptions and Use of Premises"—our case law warns against placing undue emphasis on organizational devices like headings and captions when construing documents. See, *e.g.*, *Pekin Insurance Co. v. Tovar Snow Professionals, Inc.*, 2012 IL App (1st) 111136, ¶ 14 (noting that "[t]he law is clear in Illinois that a heading or caption or title to a section of an insurance policy does not modify the coverage provided by the actual textual language appearing in the policy"); see also *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n*, 362 Ill. App. 3d 652, 661 (2005) (observing, as a matter of statutory construction, that "[h]eadings cannot limit the plain meaning of the text" (internal quotation marks omitted)). If there were any doubt on this point, section 37 of the lease makes clear that "captions appearing under the section number designations of the lease are for convenience only and are not a part of [the] lease and do not in any way limit the terms and provisions of [the] lease."

¶ 64    Tom's notes that the only true use restriction in the parties' lease is the one in section 5, which prohibits Tom's from "commit[ting] or suffer[ing] to be committed any waste on the demised premises or any nuisance." That section also requires Tom's, generally, to "comply with all applicable laws." The trial court nevertheless seems to have viewed the lease's purpose clause in section 1 as a specific use restriction, stating in its written decision that "[v]ideo gaming is a completely different *activity* than the sale of meals or the sale and consumption of alcohol." (Emphasis added.) The trial court rejected Tom's argument that section 5 of the lease was the only use restriction, stating that, "[i]f accepted," it would "turn[ ] a section that prohibits illegal actions into one that authorizes engaging in any legal activity."

¶ 65    In our view, however, section 5 *does* generally allow Tom's to engage in any legal activity, subject to the limitation in section 1 that such other activity not become the "purpose" of the leased establishment. The purpose of an establishment is different that the uses or activities that may occur in that space. The word "purpose" is variously defined as "an object or end to be attained" (Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/purpose (last visited May 14, 2021) [https://perma.cc/D4TS-36ZG]), an "end," "aim," or "goal" (Dictionary.com, https://www.dictionary.com/browse/purpose (last visited May 14, 2021) [https://perma.cc/8577-9AKN]), and "the reason for which something exists or is done" (*id.*). In the law, a corporation's "purpose" is "the business activity that [it] is chartered to engage in." Black's Law Dictionary (11th ed. 2019).

¶ 66    Tom's "purpose," as that term is commonly understood and as reflected in the definitions quoted above, did not suddenly become the operation of a video gaming business but remained that of a bar and a restaurant. A bar is now allowed, under the Act, to host video gaming terminals. It may not operate the terminals itself, however, but must contract with a licensed video gaming

terminal operator. Terminals are allowed *only* in established and licensed liquor lounges, truck stops, and fraternal or veterans' organizations. Video gaming in Illinois is thus, as Tom's states in its brief, "tied to" and "legally dependent on" the operation of an already established business. It cannot exist as a free-standing enterprise. Lynn Plaza relies heavily on these same statutory and regulatory restrictions to support its primary point—that a heavily regulated gambling business is "[i]nherently [d]ifferent" than a less-regulated restaurant and liquor lounge business. It fails to recognize, however, that it is these very restrictions that *prevent* a bar or restaurant from becoming a gambling business. We agree with Tom's that video gaming is a lawful activity that licensed liquor lounges may engage in and that Tom's did not, by adding gaming terminals to its bar and restaurant, take on an "other," *i.e.*, qualitatively different, "purpose" in violation of the parties' lease.

¶ 67    The trial court in this case became convinced that there was a factual question at the heart of this inquiry, leading to a two-day trial focused on whether, under all of the specific circumstances of the Market Square Restaurant's operations, video gaming was only an "ancillary" or "incidental" part of the business. The evidence presented might have been relevant if Lynn Plaza had a plausible argument that video gaming had taken over or supplanted the original purpose of the parties' lease. However, that was not even a possibility under the present statutory framework. The evidence at trial demonstrated that Tom's complied with the many legal requirements the State and the Board has imposed. It was permitted by law to operate only a handful of video gaming terminals (five and, more recently, six) in a cordoned-off section of its already established and licensed business. Under these restrictions, the purpose of the business could not and did not change when the video gaming terminals were added.

¶ 68    It is clear from their briefing and argument in this appeal that the parties still strongly

disagree on how one would properly quantify the money Tom's makes from hosting video gaming terminals or how best to compare those profits to profits attributable to the sale of food and alcoholic beverages. In our view, however, this whole inquiry at trial into the restaurant's revenue sources, gross income, advertising practices, allocations of space, and particular business practices was simply unnecessary. The trial court may have begun to realize this itself toward the end of the trial. During argument on the admissibility of certain exhibits, the court noted that "the overarching question" in the case was "interpreting the contractual positions." Defense counsel responded, "I agree. But we have kind of gone down a few rabbit holes here." The court responded by stating: "Well, that's what sometimes trials are for. But sometimes you come out of the trial and realize the rabbit hole hasn't helped you." We believe that is what happened here. Under the present statutory and regulatory framework, count III should have been decided in Tom's favor as a matter of law.

¶ 69    Lynn Plaza's reliance on this court's decision in *Baird & Warner, Inc. v. Al-Par, Inc.*, 183 Ill. App. 3d 467 (1989), does not convince us otherwise. The lease in *Baird* provided that the tenant would operate a " 'Health and Beauty Aide store.' " *Id.* at 468. At trial it was established, however, that the tenant sold a myriad of other items, from electronic equipment to frozen foods. *Id.* at 470-71. The trial court concluded that there had been "no real attempt at compliance" with the purpose clause of the lease, and we affirmed on appeal. *Id.* at 470, 473. *Baird* is of little significance here for several reasons. First, the purpose clause at issue in *Baird* was not reproduced in full in our decision in that case, making it difficult to confidently drawn any conclusions regarding its similarity to the one at issue here. Second, the focus on appeal was on whether the landlord could demand strict compliance with the lease after turning a blind eye to the tenant's violations for a number of years. *Id.* at 472. There was very little analysis of the breach itself,

which was treated almost as a given. And third, the items the tenant was selling in *Baird* could have been sold in a stand-alone convenience store. There was nothing preventing their sale from becoming a distinct purpose of the leased property. The same is simply not true here, under the strict regulations governing the inclusion of video gaming terminals in bars and restaurants.

¶ 70    Nor are we persuaded by Lynn Plaza's argument that this interpretation of the parties' lease will open the door for Tom's to engage in now-illegal activities, like the distribution of drugs, dog fighting, or prostitution, if those activities are someday legalized. What is acceptable in our society changes over time. Cigarette smoking, once prevalent in bars and restaurants, is now outlawed almost everywhere. Gambling, once completely restricted, is now permitted, albeit in heavily-regulated settings. We need not speculate as to what activities, if any, could change the "purpose" of the leased premises if they were made legal and became part of the Market Square Restaurant's operations. The small number of gaming terminals allowed and added here did not have that impact. The trial court's judgment in favor of Lynn Plaza on count III is reversed.

¶ 71                              C. The Award of Attorney Fees

¶ 72    "Illinois follows the 'American Rule,' which provides that absent statutory authority or a contractual agreement, each party must bear its own attorney fees and costs." *Housing Authority of Champaign County v. Lyles*, 395 Ill. App. 3d 1036, 1038 (2009). Courts must strictly construe contractual fee-shifting provisions, reading them "to mean nothing more—but also nothing less—than the letter of the text." *Erlenbush v. Largent*, 353 Ill. App. 3d 949, 952 (2004). Construction of such provisions presents a question of law, which we review *de novo*. *Bright Horizons Children's Centers, LLC v. Riverway Midwest II, LLC*, 403 Ill. App. 3d 234, 255 (2010).

¶ 73    Here, section 17 of the parties' lease provides that "[i]f any action at law or in equity shall be brought to recover any rent under this lease, or for or on account of any breach of, or to enforce

or interpret any of the covenants, terms, or conditions of this lease," the prevailing party is entitled to "reasonable attorneys' fee[s], the amount of which shall be fixed by the court." As noted above, the trial court in this case denied Lynn Plaza's request for attorney fees with respect to count I but awarded it a total of $198,484.50 under counts II-IV. The parties raise a number of legal and factual challenges to the amount of this award on appeal and cross-appeal.

¶ 74 But an award in any amount is only warranted if there has actually been a prevailing party. Our reversal of the trial court's judgment in favor of Lynn Plaza on count III means that there is no longer one prevailing party in this case. Lynn Plaza has prevailed on the CAM charges, and Tom's has prevailed on its claim that video gaming is not a violation of the parties' lease. We have repeatedly held that "[w]here the two parties 'both won and lost on claims in the proceedings below,' neither party 'can be said to have been the prevailing party.' " *Fieldcrest Builders, Inc. v. Antonucci*, 311 Ill. App. 3d 597, 608 (1999) (quoting *Brown & Kerr, Inc. v. American Stores Properties, Inc.*, 306 Ill. App. 3d 1023, 1034 (1999)); see also *In re Marriage of Linta*, 2014 IL App (2d) 130862, ¶ 19 (noting that "[w]hen a dispute involves multiple claims, and both parties have won and lost on different claims, it is appropriate to find that neither party is the prevailing party and that an award of attorney fees to either would be inappropriate"). Because the trial court's award of attorney fees to Lynn Plaza must be reversed on this basis, we need not reach the parties' other arguments regarding the propriety of that award.

¶ 75 *Cress v. Recreation Services, Inc.*, 341 Ill. App. 3d 149, 158 (2003), cited by Lynn Plaza, compels no different result. The plaintiff in *Cress* brought claims against his former employer for breach of contract, tortious interference with contract, tortious interference with prospective economic advantage, violations of the Illinois Wage Payment and Collection Act (820 ILCS 115/1 *et seq.* (West 2000)), and for a declaration that he had a right to receive retirement benefits

under the Employee Retirement Income Security Act of 1974 (ERISA) (29 U.S.C. § 1001 *et seq.* (West 1994)). *Cress*, 341 Ill. App. 3d at 158. The plaintiff prevailed on his ERISA claim, which was tried to the bench, and on his claims for breach of contract and tortious interference with contract, which were tried to a jury. *Id.* at 157. The court then awarded the plaintiff attorney fees under section 502(g) of ERISA (29 U.S.C. § 1132(g)(1) (West 1994)), which permitted the court, in its discretion, to award " 'a reasonable attorney's fee and costs of action to either party.' " *Cress*, 341 Ill. App. 3d at 189. The employer objected, on the basis that the ERISA claim was not brought until quite late in the litigation. *Id.* at 191. The *Cress* court noted that, "when multiple claims for relief are alleged in one lawsuit and the prevailing party is entitled to attorney fees under a federal fee-shifting statute, the court will award all fees spent on claims involving a 'common core of facts.' " The court concluded that the fee award was proper because, although the plaintiff sought relief under different theories, all of his claims were based on his deferred compensation agreement and involved a common core of facts. *Id.* (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983)). We are not at all convinced that the reasoning in *Cress*, which involved the application of United States Supreme Court authority governing federal fee-shifting statutes, has any bearing on this contract dispute. Even if it did, and even though the claims in this litigation were all based on the parties' lease, the propriety of the disputed CAM charges and the question of whether video gaming violates the lease do not in any sense involve a common core of facts.

¶ 76                                     IV. CONCLUSION

¶ 77     We agree with the trial court that Tom's is estopped from challenging the inclusion of reasonable management fees and ComEd leasehold charges in the CAM charges that it is required to pay a portion of under the parties' lease. We thus affirm the trial court's June 20, 2014, and December 12, 2014, orders granting summary judgment in favor of Lynn Plaza on count II.

¶ 78     We disagree with the trial court's determination that Tom's violated the purpose clause of the parties' lease when it added video gaming terminals to its restaurant and liquor lounge. We thus reverse the court's January 13, 2017, entry of a judgment in favor of Lynn Plaza on count III.

¶ 79     Finally, we reverse the trial court's award of attorney fees to Lynn Plaza as a prevailing party.

¶ 80     Affirmed in part and reversed in part.

**No. 1-20-0205**

| | |
|---|---|
| **Cite as:** | *Uncle Tom's, Inc. v. Lynn Plaza, LLC*, 2021 IL App (1st) 200205 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 11 CH 39924; the Hon. Sophia Hall, Judge presiding. |
| **Attorneys for Appellant:** | Gary A. Weintraub, of Gary A. Weintraub, P.C., of Northfield, and David A. Epstein, of D.A.E. Law Office, of Chicago, for appellant/cross-appellee. |
| **Attorneys for Appellee:** | Mark C. Gross, of Gross & Boyle, LLC, of Hinsdale, for appellee/cross-appellant. |